IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH
CAROLINA
CASE NO: 4:18-cv-00109

FINANCE SOURCE, LLC,           )
d/b/a KARMIKE USA,             )
    Plaintiff,                 )
                           )
vs.                            )
                           )
JOSEPH KESLAR,                 )
    Defendant.                 )
                           )

## COMPLAINT FOR DECLARATORY JUDGMENT AND MOTION TO VACATE ARBITRATION AWARD

COMES NOW, Plaintiff, Finance Source, LLC, d/b/a Karmike USA ("Finance Source")

and files this Complaint against Defendant, Joseph Troy Keslar ("Keslar") and states as follows:

## PRELIMINARY STATEMENTS

1.      Finance Source and Keslar entered into an agreement for the purchase of an

automobile on April 22, 2016 (the "contract") (contract attached hereto as Exhibit A.)  This

contract involved the purchase of a 2007 Suzuki Forenza sold from Finance Source to Keslar.

Contained within the contract was an arbitration provision (see Exhibit A).  After the purchase of

the automobile, a dispute arose between the Plaintiff and Defendant and Keslar demanded

binding arbitration.  The final award for the arbitrator was issued on March 26, 2018.

2.      Finance Source files this Complaint to simultaneously:

a)      Seek declaratory judgment that the arbitration award be vacated.

b)      That the arbitration award be vacated in all respects and a judgment entered ordering this matter be arbitrated under a different arbitrator and different arbitration organization.

c)      In the alternative that this Court alter the award to make it consistent with North Carolina law and other legal standards that were violated by the arbitration award.

## PARTIES

3.      Plaintiff Finance Source, LLC is a North Carolina limited liability company with its principal place of business address of Finance Source is 2946 Highway 21, Newport, North Carolina 28570.

4.      Defendant, Joseph Troy Keslar is a natural born person who is a resident of New Bern, Craven County, North Carolina.

## JURISDICTION AND VENUE

5.      This Court has Federal question and jurisdiction over this action under 28 USC § 1331 and 47 USC § 227.  Further, the Court has jurisdiction as the arbitration agreement in this case contains provisions that all actions pertaining to the contract be filed at Federal Court (see Exhibit A).  Venue in this judicial district is proper under 28 USC § 1391(b)(1) as this is the judicial district in which the respondent and claimant reside.  Further, a substantial part of the events or omissions giving rise to these claims occurred in this venue.

6.      This case is brought within three months of the issuance of the final award from the Arbitrator, pursuant to 9 USC. § 12.

## GENERAL ALLEGATIONS

7.      Keslar came to Finance Source's dealership in Newport, North Carolina to purchase a vehicle on or about April 22, 2016.

8.     Mr. Keslar was interested in a 2007 Suzuki and began negotiations with Finance Source for the purchase of the Suzuki. Keslar was not particularly interested in the overall price of the vehicle but only the amount of his monthly payment. Through the negotiating process, a cash price of the vehicle of $8,143.51 was agreed upon. (See Exhibit A).

9.     Months later, in November of 2016, counsel for the Plaintiff obtained a print out whereby it showed that the vehicle had been advertised by a third party vendor on the internet for a $5,995.00 price.

10.    Finance Source denies ever authorizing this price to be advertised on the internet.

11.    After hiring counsel, Keslar became dissatisfied with his purchase and began the process of pursuing a cause of action against Finance Source for alleged violations of the Truth in Lending Act, Breach of Good Faith and Fair Dealing, Fraud and Punitive Damages and Unfair and Deceptive Trade Practices. Keslar demanded arbitration pursuant to the terms of the arbitration agreement executed commensurate with the sale. (See Exhibit A). The arbitration provides that the arbitrator shall "apply governing substantive law and the applicable statute of limitations." The Arbitration Agreement states that there is a right to appeal under the Federal Arbitration Act contained in the arbitration provision.

## THE ARBITRATION PROCESS

12.    This matter was instituted via an Arbitration Demand filed by Keslar on February 1, 2017. (See Exhibit B). Finance Source filed a response to the arbitration demand on the 22nd of June, 2017 (see Exhibit C). The parties engaged in discovery as ordered by the arbitrator. On September 1, 2017, the arbitrator informed the parties prior to the arbitration that discovery was complete and no further discovery would take place. Further, the arbitrator informed the parties that the arbitration would take place on September 7, 2017 and would not be continued.

13.     Despite this assertion, the arbitration did not conclude on September 7, 2017. After the scheduled arbitration had taken place in New Bern, N.C., further discovery was ordered by the arbitrator and a second day of hearing took place on November 29, 2017.

14.     After the hearing, the arbitrator required that the parties file written briefs instead of a closing arguments.  Mr. Keslar filed claimant's post arbitration brief on December 11, 2017.

15.     Finance Source submitted its post arbitration memorandum on December 22, 2017 (see Exhibit D).   Keslar, without permission from the arbitrator, filed a reply to respondent's post arbitration brief on December 23, 2017 (see Exhibit E).

16.     On February 28, 2018 the arbitrator entered an "Interim Award" that was drafted as a final ruling in this matter but held open only the issue of attorney's fees to determine at a later date (see Exhibit F).  In the Interim Award, the arbitrator found that Finance Source raised the price of the vehicle because Keslar sought financing without citing any supporting facts.

17.     Further, the Interim Award ruled as a matter of law that Finance Source committed violations of the Truth in Lending Act, the North Carolina Deceptive Trade Practices Act and the Plaintiff had requested treble damages and punitive damages.  The arbitrator awarded Keslar $2,000 for the Truth in Lending Act claim, $16,066.51 for the Deceptive Trade Practices claim and $55,000 in punitive damages (see Exhibit F).  The award of punitive damages, after it is determined as a matter of law that the Defendant committed an Unfair and Deceptive Trade Practice, is contrary to North Carolina law.  The case that stands for this proposition was cited in the Interim Award see *Pinehurst, Inc. v. O'Leary Brothers Realty* 79 N.C. App. 51, (1986).

18.     Despite citing this case in the Interim Award, the arbitrator either chose to ignore North Carolina law on this subject or failed to read the Court of Appeals opinion.

19.     Pursuant to the JAMS Rules for Arbitration, Finance Source prepared a request for correction of partial final award and filed it with JAMS on February 15, 2018. (See Exhibit E). In response, the JAMS stated that the arbitrator would not consider the respondent's Motion until Finance Source paid additional fees to the arbitrator. (See Exhibit F).

20.     Keslar then filed a memorandum of law in opposition to respondent's request for correction with JAMS on February 16, 2018. (See Exhibit G). On March 11, 2018 Finance Source sent reply objections to the Plaintiff's attorney's fees Affidavit. (See Exhibit H).

21.     On or about March 26, 2018, after forcing Finance Source to pay additional fees, the arbitrator issued an Order on respondent's Rule 19 Motion and its "final award". (See Exhibit I).

22.     Despite claiming to "deny" Finance Source's request to correct, the arbitrator modified the Order and removed the treble damages award and entered the punitive damages award after allowing the Plaintiff to "opt" between punitive damages and treble damages after an Unfair and Deceptive Trade Practices finding was made as a matter of law.

23.     The arbitrator in this matter, for a two day hearing and reading the various pleadings of the parties' briefs, charged $23,523.29 in arbitration fees to Finance Source in this matter. (See Exhibit J).

## COUNT ONE

## (DECLARATORY JUDGMENT AND MOTION TO VACATE ARBITRATION AWARD)

24.     The actions of the arbitrator in this matter constitute clear errors in violation of North Carolina law and other substantive law which constitutes grounds for vacating the award. The errors are as follows:

a)      The award of punitive damages after it had been found as a matter of law that Finance Source's actions constitute a violation of the North Carolina Unfair and Deceptive Trade Practices Act is contrary to North Carolina law, specifically the case of *Pinehurst, Inc. v. O'Leary Brothers Realty* 79 N.C. App. 51, (1986). Not only was this case cited by the arbitrator, which he either ignored or did not read. When this issue was pointed out to the arbitrator, the arbitrator failed to follow North Carolina law and modified the award to impose punitive damages instead of treble damages in direct contradiction of North Carolina law.

b)      The issue of attorney's fees was decided without facts sufficient to find for attorney's fees specifically, the arbitrator found in the interim award that Finance Source had refused to resolve the claim before the arbitrator had requested any information relating to settlement negotiations prior to or after filing the request for arbitration. To make a decision without information is improper.

c)      It was error to find for Keslar when the arbitrator did not find at any time that the price increase was directly related to financing and there is insufficient evidence on this fact for such a finding as Keslar's only concern was the payment not the overall price.

d)      The arbitrator's exorbitant fees were excessive. Further, the record reveals that the case law cited by the arbitrator within the arbitrator's awards was not read by the arbitrator.

25.     The actions of the arbitrator in this case, as outlined above, constitute a manifest disregard for the law, an error of law, an award procured by undue means, and a failure to follow North Carolina Law.  Further, this amounts to misbehavior on the part of the arbitrator that prejudiced the Defendant and the arbitrator exceeded his powers by going beyond North Carolina and Federal law as required under the arbitration agreement.  For these reasons, Finance Source requests that the arbitration award be vacated in full.

## COUNT TWO

## ORDER FOR NEW ARBITRATION AND APPOINTMENT OF A DIFFERENT ARBITRATOR

26.     The numerous failures of the arbitrator to follow substantive North Carolina law as well as other relevant legal standards in the arbitration award, as well as the exorbitant fees charged, create a situation where it is not practical in any way for the arbitrator to continue to hear any issues in this matter.

27.     For that reason, Finance Source requests that, after the arbitration award is vacated that this matter be ordered to arbitration with a different arbitrator and different arbitration company so that justice can be obtained for all parties in this case and this matter be arbitrated pursuant to the relevant legal standards which have been ignored in the arbitration thus far.  For the above reasons, Finance Source requests that a new arbitrator and a new arbitration company be appointed to rehear the arbitration of this matter.


WHEREFORE, Finance Source prays:

1.      That judgment be entered vacating the arbitration award and this Court declare the arbitration award vacated;

2.   Alternatively, that this matter be ordered into arbitration with a new arbitrator and arbitration company to be selected by the parties; and

3.   Alternatively, that an Order be entered by the Court modifying the arbitration award if only partial relief is given to have the arbitration award comply with North Carolina law.

Respectfully submitted this the 20th day of June, 2018.


                              **ENNIS BAYNARD MORTON**
                              **MEDLIN & BROWN, P.A.**

                    By:   /s/Ron D. Medlin, Jr.
                          RON D. MEDLIN, JR.
                          *Counsel for Plaintiff*
                          NC State Bar No. 31682
                          P.O. Drawer 1327
                          Wrightsville Beach, NC 28480
                          Phone: (910) 256-3992


                              **STRICKLIN LAW FIRM, P.A.**

                    By:   /s/Bobby J. Stricklin
                          BOBBY J. STRICKLIN
                          *Counsel for Plaintiff*
                          NC State Bar No. 14326
                          448 Highway 70 West
                          Havelock, North Carolina 28532
                          Phone: 252-447-1064



EXHIBIT A

## BUYER'S ORDER / PURCHASE ORDER

DATE: 04/22/2016

BUYER: **Joseph Troy Keslar**

ADDRESS: **3407 Preakness Place**

CITY **New Bern**　　STATE **NC** ZIP **28562**

PHONE: **(910)650-5401**

SELLER: **KARMIKE USA**

ADDRESS: **2946 Hwy. 24**

CITY **Newport**　　STATE **NC** ZIP **28570**

PHONE: **(252)764-9159**

STOCK NUMBER **P2765**　　SALESPERSON **Harry Paul Sausser**

**I AGREE TO PURCHASE THE BELOW LISTED USED VEHICLE:**

| YEAR | MAKE | MODEL | COLOR |
|------|------|-------|-------|
| 2007 | Suzuki | Forenza | Cobalt Blue Metallic |

| VIN | MILEAGE | LICENSE |
|-----|---------|---------|
| KL5JD56Z07K687609 | 57506 | |

### LIEN HOLDER INFORMATION

SHOW LIEN TO **KarMike USA**　　PHONE **(252)764-9159**

ADDRESS **2946 Hwy. 24**

CITY, STATE, ZIP **Newport**　　**NC**　**28570**

LIEN AMOUNT **$7,755.09**

### TRADE-IN INFORMATION

| YEAR | MAKE | MODEL |
|------|------|-------|
| | | |

| VIN | MILEAGE |
|-----|---------|
| | |

| PAYOFF AMOUNT $0.00 | PAYOFF ALLOWANCE $0.00 0 |
|---------------------|--------------------------|

PAYOFF TO　　PHONE

ADDRESS

CITY, STATE, ZIP

| | |
|---|---|
| **CASH PRICE OF VEHICLE** | **$8,143.51** |
| | |
| | |
| | |
| GROSS TRADE-IN ALLOWANCE | $0.00 |
| NET TRADE-IN PAYOFF | $0.00 |
| UNPAID BALANCE OF CASH PRICE | $8,143.51 |
| TAX | $258.08 |
| LICENSE AND REGISTRATION FEES | $0.00 |
| CERTIFICATE OF TITLE FEE | $94.50 |
| DOCUMENT FEES | $459.00 |
| INSPECTION FEE | $0.00 |
| WARRANTY/SERVICE CONTRACT | $0.00 |
| GAP / CREDIT INSURANCE | $0.00 |
| SUB-TOTAL | $8,955.09 |
| CASH TENDERED (Cash & Def Downs) | $1,200.00 |
| TOTAL DUE | $7,755.09 |

DEPOSIT RECEIPT NO. _____

CASH ON DELIVERY RECEIPT NO. _____

ALL WARRANTIES, IF ANY, BY A MANUFACTURER OR SUPPLIER OTHER THAN DEALER ARE THEIRS, NOT DEALERS, AND ONLY SUCH MANUFACTURER OR OTHER SUPPLIER SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. UNLESS DEALER FURNISHES BUYER WITH A SEPARATE WRITTEN WARRANTY MADE BY DEALER ON ITS OWN BEHALF, DEALER HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ON ALL GOODS AND SERVICES SOLD BY DEALER. IN THE EVENT THAT A SERVICE CONTRACT IS SOLD BY DEALER ON ITS OWN BEHALF, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IS LIMITED IN DURATION TO THE TERM OF THE SERVICE CONTRACT.

CONTRACTUAL DISCLOSURE STATEMENT: THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

### DEPOSIT RECEIPT

Dealer hereby acknowledges receipt of the sum of _____ **$500.00** as a deposit/partial payment for the vehicle described above.

SELLER'S DISCLAIMER OF WARRANTIES: The seller makes no warranties, express or implied, on the motor vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. In disclosing the mileage and/or odometer reading of this vehicle to the buyer, the seller has relied in good faith on written information as to the mileage and/or odometer reading of the vehicle supplied by the prior owner of the vehicle and/or a statement of mileage that appears on the title certificate of the vehicle which was issued by the state in which the vehicle was last registered.

I/WE HAVE READ, UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS SET FORTH ON THIS BUYER'S ORDER.

APPROVED: _~~Marcus Dewey Clausen~~_　04/22/2016　　SIGNED: _~~signature~~_　　04/22/2016

　　　　Authorized Dealership Representative　Date　　　　　　Accepted by Customer　　Date

THIS ORDER IS NOT VALID UNLESS SIGNED AND ACCEPTED BY DEALER OR ITS AUTHORIZED REPRESENTATIVE

# LAW 553-NC-ARB-eps 7/14

## RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE
### THIS IS A CONSUMER CREDIT DOCUMENT
### (WITH ARBITRATION PROVISION)

Dealer Number __74139__    Contract Number __4291660__    04/22/2016

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| Joseph Troy Keslar<br>3407 Preakness Place<br>New Bern        NC 28562<br>Craven | | KARMIKE USA<br>2946 Hwy. 24<br>Newport        NC 28570<br>(252)764-9159 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2007 | Suzuki Forenza | KL5JD56Z07K687609 | Personal, family, or household unless otherwise indicated below<br>☐ business<br>☐ agricultural        ☐ _____ |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 1,200.00 is |
|---|---|---|---|---|
| 29.00 % | $ 3,944.91 | $ 7,755.09 | $ 11,700.00 | $ 12,900.00 |

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller or against the manufacturer of the vehicle or equipment obtained under this contract.

### Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | | Monthly beginning |
| | | |
| | | |
| Or As Follows: 36 | $325.00 | Monthly        Beginning 05/22/2016 |

Late Charge. If payment is not received in full within __10__ days after it is due, you will pay a late charge of __5__ % of the part of the payment that is late. If the vehicle is primarily for personal, family, household, or agricultural use the maximum charge for each late payment will be $ __6.00__.

Prepayment. If you pay off all your debt early you will not have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

Returned Check Charge: You agree to pay a charge of $ __25.00__ if any check you give us is dishonored.

Agreement to Arbitrate: By signing below, you agree that, pursuant to the Arbitration Provision on page 5 of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____

Co-Buyer Signs X _____

Buyer Signs X _____    Co-Buyer Signs X _____

## ITEMIZATION OF AMOUNT FINANCED

1 Cash Price (including $ ___258.08___ sales tax)       $ __8,401.59__ (1)

2 Total Downpayment =

     Trade-in _____

            (Year)      (Make)           (Model)

     Gross Trade-In Allowance                  $ __0.00__

     Less Pay Off Made By Seller               $ __0.00__

     Equals Net Trade In                      $ __0.00__

     - Cash                                $ __500.00__

     - Other ___Deferred Downs___          $ __700.00__

     (If total downpayment is negative, enter "0" and see 4I below)   $ __1,200.00__ (2)

3 Unpaid Balance of Cash Price (1 minus 2)         $ __7,201.59__ (3)

4 Other Charges Including Amounts Paid to Others on Your Behalf

    (Seller may keep part of these amounts):

    A   Cost of Optional Credit Insurance Paid to Insurance

        Company or Companies.

        Life                       $ ___0.00___

        Disability              $ ___0.00___    $ __0.00__

    B   Vendor's Single Interest Insurance Paid to Insurance Company   $ __0.00__

    C   Other Optional Insurance Paid to Insurance Company or Companies   $ __0.00__

    D   Optional Gap Contract                  $ __0.00__

    E   Official Fees Paid to Government Agencies        $ __0.00__

    F   Government Taxes Not Included in Cash Price        $ __0.00__

    G   Government License and/or Registration Fees        $ __0.00__

    H   Government Certificate of Title Fees            $ __94.50__

    I   Other Charges (Seller must identify who is paid and

       describe purpose):

| to | | for Prior Credit or Lease Balance | $ | 0.00 |
|----|----|----|----|----|
| to N/A | | for N/A | $ | 0.00 |
| to Dealer | | for Admin/Doc Fee | $ | 459.00 |
| to Dealer | | for Inspection | $ | 0.00 |
| to N/A | | for N/A | $ | 0.00 |
| to | N/A | for | N/A | $ | 0.00 |
| to | N/A | for | N/A | $ | 0.00 |
| to | N/A | for | N/A | $ | 0.00 |
| to | N/A | for | N/A | $ | 0.00 |
| to | N/A | for | N/A | $ | 0.00 |

     Total Other Charges and Amounts Paid to Others on Your Behalf   $ __553.50__ (4)

5 Amount Financed (3 + 4)               $ __7,755.09__ (5)

---

OPTION: ☐ You pay no finance charge if the Amount Financed, item 5, is paid in full on or before

_____ , Year _____ . SELLER'S INITIALS _____

---

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance) If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. **You may choose the insurance company through which the VSI insurance is obtained.** If you elect to purchase VSI insurance through the Creditor, the cost of this insurance is $ ___N/A___ and is also shown in item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

---

OPTIONAL GAP CONTRACT. A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term ___N/A___ Mos.    ___N/A___
                     Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

Buyer Signs X _____     Co-Buyer Signs X _____

---

**Insurance.** You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below:

### Optional Credit Insurance

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both

☐ Credit Disability: ☐ Buyer ☐ Co-Buyer ☐ Both

Premium:

   Credit Life $ _____N/A_____

   Credit Disability $ _____N/A_____

Insurance Company Name

_____N/A_____

Home Office Address

_____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not to buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

### Other Optional Insurance

☐

_____
      Type of Insurance            Term   N/A

Premium $ ___N/A___

Insurance Company Name _____

Home Office Address _____

☐

_____N/A_____    _N/A_
      Type of Insurance            Term

Premium $ ___N/A___

Insurance Company Name _____

Home Office Address _____

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X _____   04-27-18
   Buyer Signature                 Date

X _____   04-27-18
   Co-Buyer Signature              Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. WITHOUT SUCH INSURANCE YOU MAY NOT OPERATE THIS VEHICLE ON PUBLIC HIGHWAYS.**

Case 4:18-cv-00109-BO    Document 1    Filed 06/20/18    Page 11 of 121

## OTHER IMPORTANT AGREEMENTS

1. **FINANCE CHARGE AND PAYMENTS**
   a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.
   b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.
   c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on page 1 of this contract on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments. and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option. more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.
   d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

2. **YOUR OTHER PROMISES TO US**
   a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed. or missing.
   b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.
   c. **Security Interest.**
      You give us a security interest in:
      * The vehicle and all parts or goods installed in it;
      * All money or goods received (proceeds) for the vehicle;
      * All insurance, maintenance, service or other contracts we finance for you; and
      * All proceeds from insurance, maintenance. service or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.
      This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle. You will not allow any other security interest to be placed on the title without our written permission.

   d. **Insurance you must have on the vehicle.**
      You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and charge you must pay. The charge will be the cost of the insurance and a finance charge computed at the Annual Percentage Rate shown on page 1 of this contract.
      If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.
   e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we obtain a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**
   a. **You may owe late charges.** You will pay a late charge on each late payment as shown on page 1 of this contract. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.
   b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. Default means:
      * You do not pay any payment on time;
      * You give false, incomplete, or misleading information on a credit application;
      * You start a proceeding in bankruptcy or one is started against you or your property; or
      * You break any agreements in this contract.
      The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.
   c. **You may have to pay collection costs.** If we hire an attorney to collect what you owe, you will pay attorney's fees and court costs, as the law allows. The maximum attorney's fee you will pay will be 15% of the amount you owe.
   d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

Buyer Signs X _____  Co-Buyer Signs X _____

Case 4:18-cv-00109-BO    Document 1    Filed 06/20/18    Page 12 of 121

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

f. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

   We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **WARRANTIES SELLER DISCLAIMS**
   Unless the Seller makes an express warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

5. **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
   **Spanish Translation: Guía para compradores de vehículos usados.** La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

6. **SERVICING AND COLLECTION CONTACTS**
   You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

7. **APPLICABLE LAW**
   Federal law and the law of the state of our address shown on page 1 of this contract apply to this contract.

---

## NO COOLING OFF PERIOD

State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.

---

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

---

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding. Buyer Signs X _____ Co-Buyer Signs X _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
See the rest of this contract for other important agreements.

**NOTICE TO RETAIL BUYER: Do not sign this contract in blank.** You are entitled to a copy of the contract at the time you sign. Keep it to protect your legal rights.

---

You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read all pages of this contract, including the arbitration provision on page 5, before signing below. You confirm that you received a completely filled-in copy when you signed it.

Buyer Signs X _____ Date 04/22/2016 Co-Buyer Signs X _____ Date _____

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X _____ Address _____
Seller signs KARMIKE USA _____ Date 04/22/2016 By X Marcus DuBose Clauser _____ Title SM

Seller assigns its interest in this contract to KarMike USA _____ (Assignee) under the terms of Seller's agreement(s) with Assignee.

☐ Assigned with recourse   ☒ Assigned without recourse   ☐ Assigned with limited recourse

Seller KARMIKE USA _____ By Marcus DuBose Clauser _____ Title SM

Buyer Signs X _____ Co-Buyer Signs X _____   LAW 553-NC-ARB-eps 7/14 v1   Page 4 of 5

## ARBITRATION PROVISION
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.
2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.
3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association, 1633 Broadway, 10th Floor, New York, New York 10019 (www.adr.org), or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website. Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Provision, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Provision shall be unenforceable.

Buyer Signs X _____   Co-Buyer Signs X _____

**iLAW** FORM NO. 553-NC-ARB-eps  REV 7/14  U.S. PATENT NO. D466,782
©2014 The Reynolds and Reynolds Company
THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

# AGREEMENT TO ARBITRATE

Dealership Name: **KARMIKE USA**                                        Date: **04/22/2016**

Customer Name(s): **Joseph Troy Keslar**

Vehicle Description: **2007**    **Suzuki**    **Forenza**    **KL5JD56Z07K687609**

By entering into this Agreement to Arbitrate ("Agreement"), Customer(s) and Dealership, including any Assignee (collectively referred to as "the Parties") agree, except as otherwise provided in this Agreement, to settle by binding arbitration any dispute between them regarding: (1) the purchase by Customer(s) of the above-referenced Vehicle; (2) any products and services purchased in conjunction with the Vehicle; (3) any financing obtained in connection with the transaction; and/or (4) any dispute with respect to the existence, scope or validity of this Agreement. Matters that the Parties agree to arbitrate include, but are not limited to, disputes related to the Retail Purchase Agreement and any documents incorporated therein by reference (whether such reference is made in the Agreement or in the document itself), the application for and terms of financing for the transaction, the Finance Contract, any alleged promises, representations and/or warranties made to or relied upon by the Parties, and any alleged unfair, deceptive, or unconscionable acts or practices.

Notwithstanding any other provisions in this Agreement, the Parties agree they are not waiving their right to exercise any self-help or provisional remedy available by law or pursuant to an agreement between them. Nor is either Party required to arbitrate any individual claim that is filed and properly within the jurisdiction of a small claims court or equivalent state court. Until a Party entitled to do so requests arbitration, any Party to this Agreement may proceed with such other rights and remedies; provided, however, that neither Party waives the right to request arbitration under this Agreement by exercising other rights and remedies or by initially agreeing to litigate a claim in court. In addition, if a claim originally brought in a small claims court (or equivalent state court) is transferred or appealed to a higher trial court or if a new claim is asserted after the initial filing of such litigation, the Parties shall have the right to request arbitration under this Agreement.

This Agreement evidences a transaction involving interstate commerce. The parties acknowledge and agree that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA) shall govern any arbitration under this Agreement. The party first demanding arbitration may select the applicable rules of any one of the following Nationwide Arbitration Organizations: JAMS (1-800-448-1660), 1920 Main Street, Suite 300, Irvine, California 92614 (www.jamsadr.com) or American Arbitration Association (AAA) (1-800-778-7879), 355 Madison Ave., Floor 10, New York, New York 10017-4605 (www.adr.org); except AAA will not arbitrate individual cases where the Dealership is the filing party, the customer has not agreed to arbitrate at the time of dispute and the case involves a consumer finance matter. A copy of the Arbitration Rules may be obtained by visiting the web sites indicated or by contacting the Organization directly. The Rules in effect at the time of the request for arbitration is made will govern.

"Consumer claims" shall be arbitrated in accordance with the consumer arbitration rules and fee schedule, if any, provided for in the Arbitration Rules of the Arbitration Organization selected. If the Dealership initiates the arbitration proceedings, it will pay the entire cost of the initial filing fees. If the Customer initiates the arbitration proceedings, the Customer will pay the initial filing fees specified by the Arbitration Rules up to the amount he/she would be required to pay if the claim were filed before a state or federal court of law having proper jurisdiction over the proceeding. The Dealership will, upon Customer's request, pay any portion of the initial filing fees that exceeds this amount. The Dealership will also pay any administrative costs for the arbitration proceeding reasonably incurred by the customer that exceed $750, regardless of which Party initiates the proceedings.

To initiate an arbitration proceeding, the demanding Party must notify the other Party, in writing, that it wishes to arbitrate a dispute. The "demand" for arbitration should briefly explain the basis for the dispute, list names and addresses of the Parties involved, and specify the amount of monetary damages involved and/or any other remedy sought. The arbitrator(s) shall be attorneys or retired judges and shall be selected in accordance with the applicable Arbitration Rules. Both Parties agree that the arbitration proceedings shall take place in the county and state where the Dealership is located and the transaction occurred. They further consent to the jurisdiction of the courts of said county and state for purposes of enforcing this Agreement and the decision of the arbitrator(s). If it is inconvenient for either Party to participate in arbitration proceedings in the county where the Dealership is located, the proceedings shall be held at a mutually convenient location agreed upon by the Parties in a separate written agreement.

The arbitrator(s) shall apply and be bound by governing state and federal law when making the decision and award and shall only award those damages or other relief permitted by applicable law. Either Party may demand, at any time, a written decision from the arbitrators setting forth the findings of fact and/or conclusions of law and further agree that the arbitration proceedings and the decision of the arbitrators' shall be open to the public, even if the Rules selected provide otherwise. Nothing in this Agreement shall be interpreted as limiting or precluding the arbitrator(s) from awarding monetary damages or any other relief provided for by law. Furthermore, neither party is precluded from filing a complaint with the Office of the Attorney General of this State or from participating in a mediation program administered by the Attorney General or Better Business Bureau, but the Parties agree that by entering into this Agreement, they are waiving their right to a jury trial and their right to bring or participate in any class action or multi-plaintiff action in court or through arbitration. Once one of the Parties has demanded arbitration, binding arbitration is the exclusive method for resolving any and all claims between them. The decision of the arbitrator(s) shall be final and binding, except for any right of appeal provided by the FAA and the Arbitration Rules that governed the original arbitration proceedings. The cost of appeal shall be borne by the appealing Party.

If any term of this Agreement conflicts with the terms of any other document or agreement between the Parties, the terms of this Agreement shall prevail. If any part of this Agreement shall be declared unenforceable for any reason, the remainder of the Agreement shall remain enforceable. BY SIGNING BELOW, CUSTOMER ACKNOWLEDGES THAT HE OR SHE HAS READ THIS AGREEMENT TO ARBITRATE AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT. THIS AGREEMENT IS INCORPORATED BY REFERENCE INTO THE RETAIL PURCHASE AGREEMENT. IT MAY NOT BE MODIFIED OR AMENDED EXCEPT BY A SEPARATE WRITTEN AGREEMENT SIGNED BY CUSTOMER(S) AND AN AUTHORIZED DEALERSHIP REPRESENTATIVE.

| | 04/22/2016 | | 04/22/2016 |
|---|---|---|---|
| Customer | Date | Authorized Dealership Representative | Date |

| | 04/22/2016 |
|---|---|
| Customer | Date |

Reorder from ADR International 877-550-3900 or Online: www.buyadr.com    FEX-144 (Formerly 8181999-14452)                Copyright © 2006. ADP, Inc. © 2007. Finance Express (11/09)



JOSEPH TROY KESLAR,

    Claimant,

    vs.

FINANCE SOURCE, LLC, d/b/a KarMike USA,

    Respondent,

**ARBITRATION DEMAND**

Claimant, complaining of the Respondent, alleges and says:

## PRELIMINARY STATEMENT

1.    Claimant is bringing this action against Respondent Finance Source, LLC ("Finance Source" or "Respondent") for its violation of the Truth in Lending Act, 15 U.S.C. §§ 1601, et seq., and the regulations promulgated thereunder (The "TILA")

2.    Respondent is a finance company, doing business under the business name "KarMike USA", and is in the business of selling used cars on a buy-here-pay-here basis. Respondent sold a used motor vehicle to Claimant, illegally inflated the cash price by $2,148.51, and then charged Claimant an additional 29% finance charge for the next thirty-six (36) months. Respondent has maintained a pattern and practice of illegally inflating the cash price of its vehicles to sub-prime customers, in violation of Federal Law. Claimant is bringing this action for damages and injunctive relief pursuant to the Truth in Lending Act.

## PARTIES

3.    Claimant Joseph Troy Keslar is a natural person, and is a resident of New Bern, Craven County, North Carolina.

4.      Respondent Finance Source, LLC ("Finance Source"), is a North Carolina limited liability company, doing business under the business name KarMike USA. The principal business address of Finance Source is 2946 Hwy 24, Newport, North Carolina 28570.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(1) because this is the judicial district in which the Respondent and the Claimant reside.

## FACTUAL ALLEGATIONS

7.      On April 22, 2016, Claimant visited KarMike USA with the intent of purchasing a vehicle. He looked at a 2007 Suzuki Forenza, Vehicle Identification Number KL5JD56Z07K687609 (the "Vehicle"), for sale on the lot. Before purchasing it, he looked at the Vehicle online, and saw that it was listed on Respondent's website for $5,995.00. (Exhibit A).

8.      After a test drive and discussion with the sales representative, he decided to purchase the Vehicle.

9.      During the sales process, however, the Vehicle's price changed dramatically. In response to his inquiry into the final price of the Vehicle, Claimant was told that, because he was allegedly a high credit risk, the representative had to speak to a finance manager to work out the pricing details.

10.     The Finance Source representative took approximately four (4) hours getting the paperwork in order and going over all of Claimant's finances, without giving him a final price.

11.     When Claimant finally received the Bill of Sale, he saw that the final cash price was listed as $8,143.51. (Exhibit B).

2

12.    He inquired with the sales representative, Markus, about the price difference, and was told that the increase was because he, Claimant, was allegedly a high credit risk. Markus stated that KarMike USA was personally "loaning him the money" on the Vehicle, and needed to make sure that it was making a profit for the credit risk.

13.    Not knowing the illegality of Respondent's actions, Claimant signed a retail installment sales contract (RISC) that obligated him to pay thirty-six (36) monthly payments of $325.00, at the state maximum interest rate of 29.00%. (Exhibit C).

14.    This contract obligated Claimant to pay a total of $12,900.00 for a 2007 Suzuki that was worth, at most, $3,888.00, according to the historical NADA Clean Retail Value from April, 2016. (Exhibit D).

15.    Over the course of the next several months, Claimant's Vehicle experienced various mechanical problems. Because of this, on October 11, 2016, he took the Vehicle back to KarMike USA to trade it for a 2004 GMC Envoy.

16.    Claimant spoke to Paul, another KarMike representative, who stated that he, Paul, would need to talk with the Finance Source owner to get Claimant "the best deal possible."

17.    Claimant left and waited several days for Paul to get back to him. In the intervening period, however, Claimant discovered that the original increase of the cash price was, in fact, an illegal violation of the Truth in Lending Act.

18.    Because the increase above the advertised price cash price was not evident on the face of the RISC, much less the reason for the increase, Claimant contacted Respondent by telephone to ask about the reason for the price difference.

19.    The representative with whom Claimant spoke confirmed that the increase was because Claimant financed the Vehicle rather than paying cash. Claimant specifically asked the

3

representative whether this price would have increased if Claimant had paid cash, and was told "No". (see Transcript, attached hereto as Exhibit E).

20.     Based on Respondent's admissions, Respondent artificially and unlawfully inflated the Vehicle's cash price because of the credit sale, as opposed to preparing the RISC with the true $5,995.00 cash price.

21.     In essence, Respondent wrote into the Contract an additional $2,148.51 in fraudulent, illegal profit.

22.     Upon information and belief, Respondent's fraudulent and illegal increase of the cash price is part of a wider pattern and practice of behavior with similarly situated sub-prime customers.

23.     As a result of Respondent's actions, Claimant has had to pay an exorbitantly high price for a vehicle that is worth significantly less, higher vehicle taxes, has been left with higher monthly payments than what he would have otherwise had to pay, and has never received the benefit of his substantial down-payment.

## FIRST CLAIM FOR RELIEF
### (Truth in Lending Act)

24.     Claimant realleges all preceding paragraphs and incorporates them herein by reference.

25.     Claimant is a "consumer" as defined by 15 U.S.C. § 1602(h), in that he is a natural person who purchased the Vehicle primarily for personal, family, or household purposes.

26.     Claimant and Respondent Finance Source, LLC, d/b/a KarMike USA, entered into a Retail Installment Sales Contract for the Vehicle on or about April 22, 2016.

4

27.     Respondent Finance Source, LLC described itself as the "Creditor-Seller" on the face of the Retail Installment Sales Contract.

28.     Respondent Finance Source, LLC is a "creditor" pursuant to 15 U.S.C. § 1602(f) in that: 1) Finance Source, LLC regularly extends consumer credit for which the payment of a finance charge is required; and 2) is the entity to whom the debt is initially payable on its face.

29.     The TILA requires creditors such as Respondent Finance Source, LLC to make meaningful and accurate disclosures prior to the consummation of the transaction at issue.

30.     The term "Consummation" is defined as the moment when the consumer becomes contractually obligated.

31.     Respondent Finance Source, LLC violated TILA, 15 U.S.C. 1601 et seq., Regulation Z (12 C.F.R. § 226.1 et seq.), and the Official Staff Commentary, by failing to make meaningful and accurate disclosures prior to the consummation of the transaction relating to the Annual Percentage Rate (A.P.R.), amount financed, finance charge, and total amount of payments.

32.     Respondent Finance Source, LLC violated TILA by failing to give meaningful and accurate disclosures prior to the consummation of the sale of the Vehicle. Respondent Finance Source, LLC  disclosed the terms of the Retail Installment Sales Contract contemporaneously with the required Truth in Lending disclosures. This contemporaneous disclosure failed to provide the Claimant with a meaningful opportunity to "shop" for a better interest rate, thereby frustrating one of the stated goals of TILA.

33.     Respondent Finance Source, LLC  increased the Vehicle's cash price because Claimant was purchasing the Vehicle on credit, and Respondent deemed him to be a "high-risk" customer. Because Respondent Finance Source, LLC increased the cash price of the Vehicle as

5

an incident to the extension of credit, this increase is a finance charge which should have been disclosed to Claimant. Rather than disclosing it as required by law, Respondent hid the increase in the Vehicle's "cash price."

34.     A comparable cash customer would have no lender or lien, and therefore, a cash customer would not have had the Vehicle's price increased to cover any alleged risk of non-payment.

35.     Upon information and belief, Respondent engages in a pattern and practice of unlawfully increasing the cash price of the vehicles that it sells to sub-prime finance customers.

36.     Respondent's actions violate the TILA, Regulation Z, and the Official Staff Commentary by changing the amount financed, the finance charge, total of the payments, and the total sales price, all of which, in turn, change the disclosed Annual Percentage Rate. These changes constitute actual damages.

## SECOND CLAIM FOR RELIEF
### (Breach of Good Faith and Fair Dealing)

37.     Claimant realleges all preceding paragraphs and incorporates them herein by reference.

38.     Respondent assumed, and owed Claimant, a duty of good faith and fair dealing in connection with the Vehicle transaction.  By assuming such a duty, Respondent had an obligation to deal with Claimant fairly and honestly.

39.     Respondent also entered into a Power of Attorney with Claimant, which created a legal duty to act in good faith and in Claimant's best interests in the transaction.

40.     Respondent breached its duty of good faith and fair dealing in the following respects:

6

a. By engaging in unfair and deceptive acts and practices which affected commerce and which proximately resulted in injury to Claimant;

b. By increasing the cash price of the Vehicle because it deemed Claimant to be a high-risk credit customer; and

c. By failing to truthfully, honestly, and accurately disclose the true nature of the finance transaction and disclosures to Claimant.

41. As a direct and proximate result of Respondent's breach of its duty of good faith and fair dealing, Claimant has suffered damages and is entitled to recover damages from Respondent in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Fraud and Punitive Damages)

42. Claimant realleges all preceding paragraphs and incorporates them herein by reference.

43. Finance Source LLC, individually and through its agents and employees, falsely and fraudulently, and with the intent to defraud, represented or omitted certain material facts including, but not limited to:

a. facts of the financing transaction for the Vehicle, specifically, that Respondent had the legal right to increase the cash price of the Vehicle, in violation of the Truth in Lending Act, nullifying any benefit that Claimant received for his downpayment.

44. The above representations and/or omissions were false in fact, and Respondent knew they were false at the time they were made.

7

45. Respondent intentionally and deliberately marketed and sold the Vehicle to Claimant without disclosing, by concealing, and/or by misrepresenting the these negative material facts about the Vehicle.

46. Claimant was ignorant of the falsity of the representations, believed them to be true, and relied upon such representations in making the decision to purchase the Vehicle.

47. Respondent's representations and acts were intended to and did induce Claimant to purchase the Vehicle.

48. As a result of the foregoing fraud, Claimant has sustained actual, incidental, and consequential damages.

49. Respondent's actions were willful, malicious, and oppressive, and were taken with wanton disregard for Claimant's rights and interests.

50. Upon information and belief, Respondent's actions were and are part of a pattern and practice of behavior.

51. Respondent's conduct was outrageous, willful, and deliberate so as to render it liable for punitive damages in an amount in excess of $10,000.00.

### FOURTH CLAIM FOR RELIEF
#### (Unfair and Deceptive Acts and Practices)

52. Claimant realleges all preceding paragraphs and incorporates them herein by reference.

53. Finance Source, LLC, d/b/a KarMike USA, sells motor vehicles to consumers in the ordinary course of business.

54. Respondent's sale and financing of the Vehicle to Claimant was in commerce or affecting commerce.

8

55. Respondent's actions set forth above, specifically its violation of the TILA, breach of the duty of good faith, and fraud were deceitful, had a substantial tendency to deceive, and did in fact deceive Claimant.

56. Respondent's actions set forth above constitute unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1.

57. As a direct and proximate result of Respondent's actions, and pursuant to N.C. Gen. Stat. §§ 75-16 and 16.1, Respondent is liable to Claimant for compensatory damages in an amount to be determined at trial, rescission of the sales contract, treble damages, and Claimant's reasonable attorney fees.

WHEREFORE, Claimant prays:

1. That the Arbitrator enter an award for Claimant against Respondent for:

    a. actual damages in an amount to be proven at trial, statutory damages pursuant to 15 U.S.C. § 1640;

    b. costs and reasonable attorney fees pursuant to N.C. Gen. Stat. § 75-16.1 and 15 U.S.C. § 1640;

    c. treble damages pursuant to N.C. Gen. Stat. § 75-16; and

    d. punitive damages in excess of $10,000.00 pursuant to N.C. Gen. Stat. § 1D-1 et seq.

2. In the alternative, that the Arbitrator enter an award against Respondent for:

    a. rescission of the sales contract;

    b. refund of all funds Claimant has paid thus far;

    c. incidental and consequential damages; and

d.   costs and reasonable attorney fees pursuant to N.C. Gen. Stat. § 75-16.1 and 15 U.S.C. § 1640;

3.   That interest and the costs of this action be taxed to Respondent; and

4.   For such other and further relief as the Arbitrator may deem just and proper under the circumstances.

This the 1st day of February, 2017.

NORRIS LAW FIRM, PLLC

By: _____

J. Matthew Norris
NC Bar No. 37206
P.O. Box 1318
Wake Forest, NC 27588
Telephone: (919) 981-4475
Facsimile: (919) 926-1676
Email: matt@lemonlawnc.com
*Counsel for Claimant*

10

**EXHIBIT A**

Saved Listings

Home > Car Finder > North Carolina Used Cars > Newport, NC > Car Details: 2007 Suzuki Forenza Base

‹ Back to Results

Share    ♡ Save Th

## 2007 Suzuki Forenza Base
Karmike Usa - Newport, NC

List Price
**$5,995**

Pending Delete. Please Verif
Availability by calling the seller a
0626 ext. 49577



Call (856)272-0626 Extension 49577
For More Info and Cars Availability

| | |
|---|---|
| Price | $5,995 |
| Mileage | 57,506 miles |
| Body Style | 4dr Sedan (2L I4 5M) |
| Doors | Four Door |
| Engine | 2.00L I4 |
| Transmission | 4 Speed Automatic |
| Drive Train | Front-Wheel Drive |
| Exterior Color | Cobalt Blue Metallic |
| Interior Color | Gray Cloth Interior |
| Trim | Base |
| Stock Number | P2765 |
| Condition | Pre-Owned |
| Vin | KL51D56207K687609 |
| Fuel Efficiency | Gas<br>n/a MPG City<br>n/a MPG Highway |

### Contact the Seller

KARMIKE USA
2946 HC-24
**LOCATION**
NEWPORT, NC 28570
**CONTACT PHONE**
(856)272-0626 ext. 4957:

☑ Is this vehicle still available?
☐ Is the price negotiable?
☐ Schedule a test drive
☑ Other (Specify Below)

First Name:

Last Name:

Email:

Location: Enter Your ZIP

Phone:

Hello, I am interested in
2007 Suzuki Forenza pri
$5,995 with 57,506 mil
this vehicle still available
email me or call at your
convenience. I would lik
hear back from you soor
discuss this vehicle.

Send Message



Free
Leandro Lo
DVD



Leandro Lo
Spider Guard
Mini-Course
Improve your
Spider Guard

Learn More

### Share This Listing:

## 24x7 Live Call
## Answering

Our trained receptionists provide
stellar customer service. You get
24x7 peace of mind!

answerconnect.com

›

Tips for avoiding fraud when selling or buying a car

- Deal locally with people you can meet in person.
- Offers to ship a vehicle are virtually 100% fraudulent and will be automatically deleted
- Never use Western Union or wire transfer to pay for vehicle.

Newport Car database is updated on a daily basis, however, neither BestCarFinder nor local Newpor
guarantee that the vehicle shown will be available at the dealership.

**Newport NC**
Used cars for sale by owner
Used Suzuki

Recently Added Cars
Recently Added Cars Under $1,000
Recently Added Cars Under $2,000
Recently Added Cars Under $10,000

http://www.bestcarfinder.com/cars-for-sale-north-carolina/newport-nc/suzuki-48587869.html

1/2

# BUYER'S ORDER / PURCHASE ORDER

DATE: 04/22/2016

BUYER: Joseph Troy Keslar

ADDRESS: 3407 Preakness Place

CITY New Bern          STATE NC  ZIP 28562

PHONE: (910)650-5401

SELLER: KARMIKE USA

ADDRESS: 2946 Hwy. 24

CITY Newport          STATE NC  ZIP 28570

PHONE: (252)764-9159

I AGREE TO PURCHASE THE BELOW LISTED USED VEHICLE:

| YEAR | MAKE | MODEL | STOCK NUMBER | SALESPERSON |
|------|------|-------|--------------|-------------|
| 2007 | Suzuki | Forenza | P2765 | Harry Paul Sausser |
| VIN KL5JD56Z07K687609 | | MILEAGE 57506 | COLOR Cobalt Blue Metallic | |
| | | | LICENSE | |

### LIEN HOLDER INFORMATION

SHOW LIEN TO
KarMike USA

ADDRESS
2946 Hwy. 24

CITY, STATE, ZIP
Newport          NC   28670

PHONE
(252)764-9159

LIEN AMOUNT
$7,755.09

### TRADE-IN INFORMATION

| YEAR | MAKE | MODEL |
|------|------|-------|
| VIN | | MILEAGE |
| PAYOFF AMOUNT $0.00 | | PAYOFF ALLOWANCE $0.00 0 |
| PAYOFF TO | | PHONE |
| ADDRESS | | |
| CITY, STATE, ZIP | | |

| | |
|---|---|
| CASH PRICE OF VEHICLE | $8,143.51 |
| GROSS TRADE-IN ALLOWANCE | $0.00 |
| NET TRADE-IN PAYOFF | $0.00 |
| UNPAID BALANCE OF CASH PRICE | $8,143.51 |
| TAX | $258.08 |
| LICENSE AND REGISTRATION FEES | $0.00 |
| CERTIFICATE OF TITLE FEE | $94.50 |
| DOCUMENT FEES | $459.00 |
| INSPECTION FEE | $0.00 |
| WARRANTY/SERVICE CONTRACT | $0.00 |
| GAP / CREDIT INSURANCE | $0.00 |
| SUB-TOTAL | $8,955.09 |
| CASH TENDERED (Cash & Def Downs) | $1,200.00 |
| TOTAL DUE | $7,755.09 |
| DEPOSIT RECEIPT NO. | |
| CASH ON DELIVERY RECEIPT NO. | |

ALL WARRANTIES, IF ANY, BY A MANUFACTURER OR SUPPLIER OTHER THAN DEALER ARE THEIRS, NOT DEALERS, AND ONLY SUCH MANUFACTURER OR OTHER SUPPLIER SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. UNLESS DEALER FURNISHES BUYER WITH A SEPARATE WRITTEN WARRANTY MADE BY DEALER ON ITS OWN BEHALF, DEALER HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ON ALL GOODS AND SERVICES SOLD BY DEALER. IN THE EVENT THAT A SERVICE CONTRACT IS SOLD BY DEALER ON ITS OWN BEHALF, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IS LIMITED IN DURATION TO THE TERM OF THE SERVICE CONTRACT.

CONTRACTUAL DISCLOSURE STATEMENT: THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

### DEPOSIT RECEIPT

Dealer hereby acknowledges receipt of the sum of ___$500.00___ as a deposit/partial payment for the vehicle described above.

SELLER'S DISCLAIMER OF WARRANTIES: The seller makes no warranties, express or implied, as to the mileage and/or odometer reading of the vehicle supplied by the prior owner of the vehicle and/or a statement of mileage that appears on the title certificate of merchantability or of fitness for a particular purpose. In disclosing the mileage and/or odometer reading of this vehicle to the buyer, the seller has relied in good faith on which the vehicle which was issued by the state in which the vehicle was last registered.

I/WE HAVE READ, UNDERSTAND, AND AGREE TO THE TERMS AND CONDITIONS SET FORTH ON THIS BUYER'S ORDER.

APPROVED: _____  04/22/2016   SIGNED _____
Authorized Dealership Representative    Date                    Signature of Customer     04/22/2016
                                                                                              Date

THIS ORDER IS NOT VALID UNLESS SIGNED AND ACCEPTED BY DEALER OR ITS AUTHORIZED REPRESENTATIVE.


## Vehicle Information

**EXHIBIT C**



| | |
|---|---|
| Vehicle: | 2007 Suzuki Forenza Sedan 4D 2.0L I4 |
| Region: | Southeastern |
| Period: | April 22, 2016 |
| VIN: | KL5JD56Z07K687609 |
| Mileage: | 57,506 |
| Base MSRP: | $13,999 |
| Typically Equipped MSRP: | N/A |
| Weight: | 2,756 |

## NADA Used Cars/Trucks Values

| Auction* | Base | Mileage Adj. | Option Adj. | Adjusted Value |
|---|---|---|---|---|
| Low | N/A | N/A | N/A | N/A |
| Average | N/A | N/A | N/A | N/A |
| High | N/A | N/A | N/A | N/A |
| Trade-In | | | | |
| Rough | $675 | $813 | N/A | $1,488 |
| Average | $1,200 | $813 | N/A | $2,013 |
| Clean | $1,625 | $813 | N/A | $2,438 |
| Clean Loan | $1,475 | $813 | N/A | $2,288 |
| Clean Retail | $3,075 | $813 | N/A | $3,888 |

*The auction values displayed include typical equipment and adjustments for mileage and any of the following applicable accessories: engine size, drivetrain, and trim.

NADA Used Car Guide assumes no responsibility or liability for any errors or omissions or any revisions or additions made by anyone on this report.
NADA Used Car Guide and its logo are registered trademarks of National Automobile Dealers Association, used under license by J.D. Power and Associates.
©2016 J.D. Power and Associates

 

**ILAW 553-NC-ARB-eps 7/14**

**EXHIBIT D**

**RETAIL INSTALLMENT SALE CONTRACT - SIMPLE FINANCE CHARGE**
**THIS IS A CONSUMER CREDIT DOCUMENT**
**(WITH ARBITRATION PROVISION)**

Dealer Number 74133    Contract Number 4291560    04/22/2016

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| Joseph Troy Kesler | | KARMIKE USA |
| 3407 Preakness Place | | 2646 Hwy. 24 |
| New Bern          NC  28562 | | Newport          NC  28570 |
| Craven | | (252)764-9155 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2007 | Suzuki Forenza | XL5JP56207K687609 | ☐ Personal, family or household unless otherwise indicated below ☐ business ☐ agricultural |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 1,200.00 |
|---|---|---|---|---|
| 25.00 % | $ 3,944.91 | $ 7,755.09 | $ 11,700.00 | $ 12,900.00 |

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | | Monthly beginning |
| Or As Follows: 36 | $325.00 | Monthly    Beginning 05/22/2016 |

Late Charge. If payment is not received in full within ___10___ days after it is due, you will pay a late charge of ___5___ % of the part of the payment that is late. If the vehicle is primarily for personal, family, household, or agricultural use, the maximum charge for each late payment will be $ ___6.00___

Prepayment. If you pay off all your debt early, you will not have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

Returned Check Charge. You agree to pay a charge of $ ___25.00___ if any check you give us is dishonored.

Agreement to Arbitrate: By signing below, you agree that, pursuant to the Arbitration Provision on page 5 of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____
Co-Buyer Signs X _____

Buyer Signs X _____    Co-Buyer Signs X _____

LAW 553-NC-ARB-eps 7/14 v1   Page 1 of 5

**ITEMIZATION OF AMOUNT FINANCED**

1. Cash Price including S._____ 238 .08 (sales tax)  $ 8,801.59 (1)
2. Total Downpayment =
   Trade In:
   _____ (Year) _____ (Make) _____ (Model)
   Gross Trade-In Allowance                              $    0.00
   Less Pay Off Made By Seller                           $    0.00
   Equals Net Trade In                                   $    0.00
   + Cash                                                $  500.00
   + Other   Deferred Downs                              $  700.00
   (if total downpayment is negative, enter "0" and see 4I below)  $  1,200.00 (2)
3. Unpaid Balance of Cash Price (1 minus 2)             $ 7,201.59 (3)
4. Other Charges Including Amounts Paid to Others on Your Behalf
   (Seller may keep part of these amounts):
   A. Cost of Optional Credit Insurance Paid to Insurance
      Company or Companies
      Life                          $    0.00
      Disability                    $    0.00             $    0.00
   B. Vendor's Single Interest Insurance Paid to Insurance Company  $    0.00
   C. Other Optional Insurance Paid to Insurance Company or Companies  $    0.00
   D. Optional Gap Contract                              $    0.00
   E. Official Fees Paid to Government Agencies          $    0.00
   F. Government Taxes Not Included in Cash Price        $    0.00
   G. Government License and/or Registration Fees        $    0.00
   H. Government Certificate of Title Fees               $   24.50
   I. Other Charges (Seller must identify who is paid and
      describe purpose):
      to _____ for Prior Credit or Lease Balance    $    0.00
      to N/A for N/A                                     $    0.00
      to Dealer for Admin/Doc Fee                        $  458.00
      to Dealer for Inspection                           $    0.00
      to N/A for N/A                                     $    0.00
      to _____ for _____ N/A                   $    0.00
      to N/A for N/A                                     $    0.00
      to N/A for N/A                                     $    0.00
      to N/A for N/A                                     $    0.00
      to N/A for N/A                                     $    0.00
   Total Other Charges and Amounts Paid to Others on Your Behalf  $  552.50 (4)
5. Amount Financed (3 + 4)                               $ 7,255.09 (5)

OPTION: ☐ You pay no finance charge if the Amount Financed, item 5, is paid in full on or before
_____ , _____ Year .  SELLER'S INITIALS _____

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose this insurance company through which the VSI insurance is obtained, if you elect to purchase VSI insurance through the Creditor, the cost of this insurance is $ _____ N/A _____ and is also shown in item 4B of the Itemization of Amount Financed. The coverage is for the initial term of this contract.

OPTIONAL GAP CONTRACT. A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ N/A _____ Mos.                _____ N/A _____
                                            Name of Gap Contract
I want to buy a gap contract.
Buyer Signs X _____

Buyer Signs X _____    Co-Buyer Signs X _____

---

Insurance. You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the Insurance you want and sign below.

**Optional Credit Insurance**

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability: ☐ Buyer ☐ Co-Buyer ☐ Both
Premium

Credit Life $ _____ N/A _____

Credit Disability $ _____ N/A _____
Insurance Company Name

Home Office Address

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not to buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

**Other Optional Insurance**

☐ _____ N/A _____
Type of Insurance          Term
Premium $ _____ N/A _____
Insurance Company Name

_____ N/A _____
Home Office Address

☐ _____ N/A _____
Type of Insurance          Term
Premium $ _____ N/A _____
Insurance Company Name

Home Office Address

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X _____                        04/22/2016
Buyer Signature                     Date

X _____                        04/22/2016
Co-Buyer Signature                  Date

THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. WITHOUT SUCH INSURANCE YOU MAY NOT OPERATE THIS VEHICLE ON PUBLIC HIGHWAYS.

LAW 553-NC-ARB-eps 7/14 v1   Page 2 of 5.

## OTHER IMPORTANT AGREEMENTS

1. **FINANCE CHARGE AND PAYMENTS**
   a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.
   b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.
   c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on page 1 of this contract on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.
   d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

2. **YOUR OTHER PROMISES TO US**
   a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.
   b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.
   c. **Security Interest.**
   You give us a security interest in:
   • The vehicle and all parts or goods installed in it;
   • All money or goods received (proceeds) for the vehicle;
   • All insurance, maintenance, service or other contracts we finance for you; and
   • All proceeds from insurance, maintenance, service or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.
   This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle. You will not allow any other security interest to be placed on the title without our written permission.

   d. **Insurance you must have on the vehicle.** You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and charge you must pay. The charge will be the cost of the insurance and a finance charge computed at the Annual Percentage Rate shown on page 1 of this contract.
   If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.
   e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we obtain a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**
   a. **You may owe late charges.** You will pay a late charge on each late payment as shown on page 1 of this contract. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.
   b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. Default means:
   • You do not pay any payment on time;
   • You give false, incomplete, or misleading information on a credit application;
   • You start a proceeding in bankruptcy or one is started against you or your property; or
   • You break any agreements in this contract.
   The amount you owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.
   c. **You may have to pay collection costs.** If we hire an attorney to collect what you owe, you will pay attorney's fees and court costs, as the law allows. The maximum attorney's fee you will pay will be 15% of the amount you owe.
   d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

Buyer Signs X _____  Co-Buyer Signs X _____

LAW 553-NC-ARB-eps 7/14 v1   Page 3 of 5.

e. How you can get the vehicle back if we take it. If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

f. We will sell the vehicle if you do not get it back. If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.
We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

g. What we may do about optional insurance, maintenance, service, or other contracts. This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. WARRANTIES SELLER DISCLAIMS
Unless the Seller makes an express warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

5. Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

6. SERVICING AND COLLECTION CONTACTS
You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

7. APPLICABLE LAW
Federal law and the law of this state of our address shown on page 1 of this contract apply to this contract.

---

**NO COOLING OFF PERIOD**
State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

HOW THIS CONTRACT CAN BE CHANGED. This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding. Buyer Signs X _____ Co-Buyer Signs X _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
See the rest of this contract for other important agreements.

NOTICE TO RETAIL BUYER: Do not sign this contract in blank. You are entitled to a copy of the contract at the time you sign. Keep it to protect your legal rights.

You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read all pages of this contract, including the arbitration provision on page 5, before signing below. You confirm that you received a completely filled-in copy when you signed it.

Buyer Signs X _____ Date 04/22/2016 Co-Buyer Signs X _____ Date 04/22/2016

Co-Buyers and Other Owners – A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X _____ Address _____

Seller KARNIKE USA _____ Date 04/22/2016 By X _____ Title SM

Seller assigns its interest in this contract to KARNIKE USA (Assignee) under the terms of Seller's agreement(s) with Assignee.
☐ Assigned with recourse. ☒ Assigned without recourse. ☐ Assigned with limited recourse.

Seller KARNIKE USA _____ By _____ Title SM

Buyer Signs X _____ Co-Buyer Signs X _____  LAW 553-NC-ARB-apr 7/14 v1 Page 4 of 5

## ARBITRATION PROVISION
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.

2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.

3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association, 1633 Broadway, 10th Floor, New York, New York 10019 (www.adr.org), or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website. Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Provision, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Provision shall be unenforceable.

Buyer Signs X _____   Co-Buyer Signs X _____

LAW FORM NO. 553-NC-ARB-eps (REV 3/14) (C) COPYRIGHT 2014 BY LAW
©2014 "AS FORMS AND PLACES OF USE"
THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO CONTENT OR
FITNESS FOR PURPOSE. BE THE FORM. CONSULT YOUR LEGAL COUNSEL.

LAW 553-NC-ARB-eps 7/14 v1   Page 5 of 5

# AGREEMENT TO ARBITRATE

Dealership Name: KARMIKE USA                                    Date: 04/22/2016

Customer Name(s): Joseph Troy Keslar

Vehicle Description: 2007    Suzuki    Forenza    KL5JD56Z07K687606

By entering into this Agreement to Arbitrate ("Agreement"), Customer(s) and Dealership, including any Assignee (collectively referred to as "the Parties") agree, except as otherwise provided in this Agreement, to settle by binding arbitration any dispute between them regarding: (1) the purchase by Customer(s) of the above-referenced Vehicle; (2) any products and services purchased in conjunction with the Vehicle; (3) any financing obtained in connection with the transaction; and/or (4) any dispute with respect to the existence, scope or validity of this Agreement. Matters that the Parties agree to arbitrate include, but are not limited to, disputes related to the Retail Purchase Agreement and any documents incorporated therein by reference (whether such reference is made in this Agreement or in the Contract itself), the application for and terms of financing for the transaction, the Finance Contract, any alleged promises, representations, and/or warranties made to or relied upon by the Parties, and any alleged unfair, deceptive, or unconscionable acts or practices.

Notwithstanding any other provision in this Agreement, the Parties agree they are not waiving their right to exercise any self-help or provisional remedy available by law or pursuant to an agreement between them. Nor is either Party required to arbitrate any individual claim that is filed and properly within the jurisdiction of a small claims court or equivalent state court. Until a Party entitled to do so requests arbitration, any Party to this Agreement may proceed with such other rights and remedies; provided, however, that neither Party waives the right to request arbitration under this Agreement by exercising other rights and remedies or by initially agreeing to litigate a claim in court. In addition, if a claim originally brought in a small claims court (or equivalent state court) is transferred or appealed to a higher trial court or if a new claim is asserted after the initial filing of such litigation, the Parties shall have the right to request arbitration under this Agreement.

This Agreement evidences a transaction involving interstate commerce. The Parties acknowledge and agree that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA) shall govern any arbitration under this Agreement. The party first demanding arbitration may select the applicable rules of any one of the following Nationwide Arbitration Organizations: JAMS (1-800-352-5267), 1920 Main Street, Suite 300, Irvine, California 92614 (www.jamsadr.com) or American Arbitration Association (AAA) (1-800-778-7879) , 335 Madison Ave., Floor 10, New York, New York 10017-4605 (www.adr.org); except AAA will not arbitrate individual cases where the Dealership is the filing party, the customer has not agreed to arbitrate at the time of dispute and the case involves a consumer finance matter. A copy of the Arbitration Rules may be obtained by visiting the web sites indicated or by contacting the Organization directly. The Rules in effect at the time of the request for arbitration is made will govern.

"Consumer claims" shall be arbitrated in accordance with the consumer arbitration rules and fee schedule, if any, provided for in the Arbitration Rules of the Arbitration Organization selected. If the Dealership initiates the arbitration proceedings, it will pay the entire cost of the initial filing fees. If the Customer initiates the arbitration proceedings, the Customer will pay the initial filing fees specified by the Arbitration Rules up to the amount he/she would be required to pay if the claim were filed before a state or federal court of law having proper jurisdiction over the proceeding. The Dealership will, upon Customer's request, pay any portion of the initial filing fees that exceeds this amount. The Dealership will also pay any administrative costs for the arbitration proceeding reasonably incurred by the customer that exceed $750, regardless of which Party initiates the proceeding.

To initiate an arbitration proceeding, the demanding Party must notify the other Party, in writing, that it wishes to arbitrate a dispute. The "demand" for arbitration should briefly explain the basis for the dispute; list names and addresses of the Parties involved, and specify the amount of monetary damages involved and/or any other remedy sought. The arbitrator(s) shall be attorneys or retired judges and shall be selected in accordance with the applicable Arbitration Rules. Both Parties agree that the arbitration proceedings shall take place in the county and state where the Dealership is located and the transaction occurred. They further consent to the jurisdiction of the courts of said county and state for purposes of enforcing this Agreement and the decision of the arbitrator(s). If it is inconvenient for either Party to participate in arbitration proceedings in the county where the Dealership is located, the proceedings shall be held at a mutually convenient location agreed upon by the Parties in a separate written agreement.

The arbitrator(s) shall apply and be bound by governing state and federal law when making the decision and award and shall only award those damages or other relief permitted by applicable law. Either Party may demand, at any time, a written decision from the arbitrators setting forth the findings of fact and/or conclusions of law and further agree that the arbitration proceedings and the decision of the arbitrators shall be open to the public, even if the Rules selected provide otherwise. Nothing in this Agreement shall be interpreted or precluding the arbitrator(s) from awarding monetary damages or any other relief provided for by law. Furthermore, neither party is precluded from filing a complaint with the Office of the Attorney General of this State or from participating in a mediation program administered by the Attorney General or Better Business Bureau, but the Parties agree that by entering into this Agreement, they are waiving their right to a jury trial and their right to bring or participate in any class action or multi-plaintiff action in court or through arbitration. Once one of the Parties has demanded arbitration, binding arbitration is the exclusive method for resolving any and all claims between them. The decision of the arbitrator(s) shall be final and binding, except for any right of appeal provided by the FAA and the Arbitration Rules that governed the original arbitration proceedings. The cost of appeal shall be borne by the appealing Party.

If any term of this Agreement conflicts with the terms of any other document or agreement between the Parties, the terms of this Agreement shall prevail. If any part of this Agreement shall be declared unenforceable for any reason, the remainder of the Agreement shall remain enforceable. BY SIGNING BELOW, CUSTOMER ACKNOWLEDGES THAT HE OR SHE HAS READ THIS AGREEMENT TO ARBITRATE AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT. THIS AGREEMENT IS INCORPORATED BY REFERENCE INTO THE RETAIL PURCHASE AGREEMENT. IT MAY NOT BE MODIFIED OR AMENDED EXCEPT BY A SEPARATE WRITTEN AGREEMENT SIGNED BY CUSTOMER(S) AND AN AUTHORIZED DEALERSHIP REPRESENTATIVE.

_____  04/22/2016        _____  04/22/2016
Customer                   Date              Authorized Dealership Representative   Date

_____  04/22/2016
Customer                   Date

Reprinted from ADR International 877-536-5908 or Call at: www.ADRadvisors.com    REV-144 (formerly 311-1288-14AD)          Copyright © 2005, ADR, L.L.C. © 2007, Reprise Business Resources



1   Mark: You here Joseph?

2   Joseph: Yeah, I'm here.

3   Mark: What's your last name?

4   Joseph: It's Keslar, K-E-S-L-A-R. I can't hear you very well.

5   Mark: I'm sorry buddy. I got you on speaker right now. I got my hands on the keyboard.

6   Joseph: Oh, understandable.

7   Mark: K-E...

8   Joseph: ...S-L-A-R.

9   Mark: Alright. There we are. [0:00:34]. Alright, so the sales price was sold to you at $8143.51,
10  of course you financed $7705.

11  Joseph: Okay, but the list price that we discussed that was online was for $5995 and I was just
12  wondering...

13  Mark: [0:00:57].

14  Joseph: Okay.

15  [Put on hold – music playing]

16  Mark: [0:01:16]. Sorry about that man. It's just I'm fuckin busy here. When it comes to... Are
17  you still there?

18  Joseph: Yeah.

19  Mark: When it comes to [0:01:25] finance company, I have to have a certain amount invested into
20  this car of course to turn around and try and make a profit. Not that it's you, but in the past
21  [0:01:18] I might get a good three to six months out of somebody so by the time I have to go ahead
22  and get it back, the repos, the tax, the title and everything else, [0:01:46] cost me more.

23  Joseph: Okay, so that's why the price was changed because I financed it through you? Like, is
24  that what you're saying? Because I mean that makes, that makes sense.

1

1  Mark: [0:01:58] there's a cash price. If you were to come in here with five or 5900 bucks, I

2  [overlapping]

3  Joseph: I could of bought for that amount, but since I...

4  Mark: What was that?

5  Joseph: Like if had walked in and I had like here's $6,000 plus taxes for the Suzuki, I can take it

6  off the lot, yeah?

7  Mark: Exactly.

8  Joseph: But since I have to finance it through you it's, the cash price changes to $8,143.51?

9  Mark: That is correct.

10  Joseph: Okay, so it's cuz of the financing because it's buy here, pay here.

11  Mark: Yes sir.

12  Joseph: Okay. Alright. Is, are there any vehicles that um we could look at or anything like that?

13  Do you have any other options besides the Envoy? Or if you've talked to the owner; I mean I'd

14  appreciate it cuz you know I'm consistent with my payments. I've made them all on time. We

15  haven't had any problems. One little hiccup at the beginning, but other than that [overlapping].

16  Mark: [0:02:49]. He's pretty full on policy. I did have a chance -- when I had you on hold, I

17  actually talked to him about the Envoy. I [0:02:56], now he's on vacation. He was busy, I was

18  busy. We don't really, we really don't talk as much as people think we talk but I did track him

19  down and... He has a policy that he doesn't, he tries not to [0:03:10] this policy. It's not because

20  it's who you are...

21  Joseph: No, I understand. I understand. I understand.

22  Mark: [Overlapping].

23  Joseph: You have to take the collective into consideration you know.

24  Mark: Yeah and...

Case 4:18-cv-00109-BO   Document 1   Filed 06/20/18   Page 36 of 121

1   Joseph: But just, just so it's clear, the only reason that it is $8,143.51 is cuz I had to finance it

2   through you.

3   Mark: Right. The, the advertised price was a cash price.

4   Joseph: Okay, cash price only?

5   Mark: Yes sir.

6   Joseph: Okay, alright, thank you very much Mark. [0:03:42]


Online Services

# CERTIFICATE OF TRANSCRIPTION

I, Brandi Darmanin, Vendor Manager of Vanan Online Services, certify that our translator is fluent (conversant) in the English language, and that the attached document is an accurate translation of the document entitled "Keslar Conversation".

Dated 31st day of January, 2017

Signed by: _Brandi D_

Printed Name : Brandi Darmanin

Vanan Online Services, Inc. 4444 Germanna Hwy., Suite 365, Locust Grove, Virginia 22508.

Ph. 888-535-5668

Vanan Online Services, Inc.

ISO 9001:2008

EIN: 81-3795675

Commonwealth of Virginia :County of Orange

I certify this to be the original document on this 31 day of January, 20 17.

_Kristiana Beard_

RISTIANA BEARD, Notary Public 87885353
Ay Commission Expires 10-31-2020

KRISTIANA BEARD
Notary Public
Commonwealth of Virginia
Registration No. 7685353
My Commission Expires Oct 31, 2020



EXHIBIT
C
Blumberg No. 5208

JAMS Ref No.

)
)
JOSEPH TROY KESLAR,                     )
)
        Claimant                         )
)          RESPONSE TO
)          ARBITRATION DEMAND
        vs.                              )
)
FINANCE SOURCE, LLC, d/b/a              )
KARMIKE USA                             )
)

Respondent, answering the Arbitration Demand of the Claimant, alleges and says:

1.      Respondent denies that it has violated the Truth in Lending Act, 15 U.S.C. Section 1601, et seq., and the regulations promulgated thereunder (The "TILA").

2.      Respondent admits that it is in the business of selling previously owned motor vehicles and that it sometimes sells such vehicles on a finance system that allows the purchasers to make their payments directly to the Respondent. Respondent admits that it sold a vehicle to the Claimant and that, as a result of the Claimant's remarkably low credit score and history of "serious delinquency" appearing upon his credit report, the Respondent agreed to finance a portion ($7,755.09) of the Claimant's agreed upon purchase price ($8,143.51) for the vehicle. The remaining portion of Claimant's paragraph 2 is denied.

3.      Respondent is not able to verify the current residence of the Claimant. However, the remaining portion of Claimant's paragraph 3 is admitted.

4.      The allegations in Claimant's paragraph 4 are admitted.

5.      The allegations in Claimant's paragraph 5 are admitted.

6.      The allegations in Claimant's paragraph 6 are admitted.

### RESPONSE TO FACTUAL ALLEGATIONS

7.      Respondent admits that on April 22, 2016 the Claimant visited the Respondent's location and inquired about purchasing a vehicle. However, the Claimant did not originally inquire about the 2007 Suzuki vehicle which he ultimately purchased. The Claimant first inquired about a 1997 Jeep Grand Cherokee. However, the Claimant stated that he was not able to make the amount of the payments which were required to purchase the 1997 Jeep Grand

Cherokee. Subsequent to the Claimant's inability to enter into a purchase agreement for the 1997 Jeep, the Claimant looked at the 2007 Suzuki, which he eventually purchased. At no time during the Claimant's conversation on April 22, 2016 did he make a statement about first seeing an online ad listing the 2007 Suzuki for sale at a price of $5,995.00. Further, the website depicted upon Claimant's Exhibit A is not the Respondent's website and Respondent has never authorized any advertisement of a purchase for the subject vehicle except the original stated purchase price of $8,495.00.

8.    The allegations in Claimant's paragraph 8 are admitted.

9.    The allegations in Claimant's paragraph 9 are denied. As a further defense, the sales price listed upon the vehicle at the time and date the Claimant entered the Respondent's property was $8,495.00. The Respondent agreed to reduce the purchase price to the amount of $8,143.51 so that it could be financed with a monthly payment in the amount of $325.00, which is what the Claimant had advised the Respondent's sales representative was the amount of monthly payment he would be able to make. In addition, once a price had been agreed upon by the Claimant and Respondent's sales representative, the Claimant advised that he did not actually have sufficient funds for the required down payment. Notwithstanding the fact that Respondent gave the Claimant credit for a $1,200.00 down payment as of the sale date, Claimant only paid $500.00 as a down payment at the time of the sale. Claimant made a payment of $350.00 on May 6, 2016 and another payment of $350.00 on May 13, 2016 to complete his payment of the required down payment. However, the Claimant was given credit for a total down payment in the amount of $1,200.00 as of the date of sale, April 22, 2016. No finance charges were assessed or collected from the Claimant for the portion of the down payment not paid at the time of the sale.

10.   The allegations in Claimant's paragraph 10 are denied. The Claimant was provided the final price of $8,143.51, subsequent to a reduction of the original sales price of $8,495.00 after his test drive of the vehicle which was approximately two (2) hours after the Claimant first came upon the Respondent's property.

11.   The allegations in Claimant's paragraph 11 are denied. The price was initially presented on a "customer proposal form" well before the Claimant was shown or given a bill of sale. This "customer proposal form" reveals to the customer the sales price, down payment and the monthly payment. We present this to the customer in order to make sure there are no objections to what the final papers will state. The "customer proposal" was also initially done when the Claimant first looked at the 1997 Jeep Grand Cherokee. That is how we knew there was a problem and had to sell him a different automobile. The "customer proposal" revealed a payment much higher than what he could afford because of the short loan term length. That is why we showed the Claimant the Suzuki Forenza.

12.   The allegations in Claimant's paragraph 12 are denied. Subsequent to the sale, and at later dates, Mr. Keslar telephoned a sales representative of the Respondent and they had several conversations. The Respondent is not aware of the exact content of all those

telephone conversations. However, on the date of purchase, there were no conversations between the Claimant and any representative of the Respondent which contained any statement regarding an increase in the purchase price. There was no increase of the purchase price of the 2007 Suzuki which was purchased by the Claimant. At some point in time the Claimant was advised that a further reduction in the purchase price could have been agreed upon if the Claimant had been able to pay cash for his purchase. However, the fact that he was unable to pay cash did not cause an increase in the purchase price.

13. Respondent admits that the Claimant signed the document identified as Exhibit D. That document speaks for itself. The remainder of paragraph 13 is denied. Exhibit C has no relevance to the allegations in Claimant's paragraph 13.

14. Respondent agrees that, had the Claimant made all of his scheduled payments on time, he would have paid a total sum of $12,900, which includes interest. Exhibit D has no relevance to the remaining allegations in Claimant's paragraph 14. Respondent denies the remaining allegations in paragraph 14.

15. Respondent admits that, at some point in time, the Claimant appeared upon the Respondent's property and inquired about trading his vehicle in towards the purchase of a SUV type vehicle. The Claimant did not, at any time, contact the Respondent with a complaint about the mechanical condition of the vehicle. At the time of its purchase by the Claimant, the Respondent provided to the Claimant a Limited Warranty. A copy of that Limited Warranty has been marked as Exhibit A, is attached hereto, and is hereby incorporated by reference. Further, upon Respondent's receipt of the vehicle from the Claimant the Respondent had the vehicle inspected by a mechanic. The inspection revealed that the vehicle now had 66,562 miles (it had 57,506 miles at the time Claimant purchased the vehicle). It also revealed that the oil had turned to sludge from a failure too properly change the oil. Due to the condition of the oil, the vehicle's motor stopped operating. Any remaining portion of Claimant's allegations in paragraph 15 are denied.

16. Respondent does not have sufficient information to either admit or deny this allegation, therefore, it is denied.

17. Respondent specifically denies there was either an ""increase of the cash price" or any "illegal violation of the Truth in Lending Act". Respondent does not have sufficient information to either admit or deny the remaining portions of paragraph 17, therefore, they are denied.

18. The allegations in Claimant's paragraph 18 are denied.

19. The allegations in Claimant's paragraph 19 are denied.

20. The allegations in Claimant's paragraph 20 are denied.

21. The allegations in Claimant's paragraph 21 are denied.

22. The allegations in Claimant's paragraph 22 are denied.

23. The allegations in Claimant's paragraph 23 are denied.

## RESPONSE TO FIRST CLAIM FOR RELIEF

24. Respondent realleges its responses to Claimants paragraphs 1 through 23 as set forth above as if the same were fully stated herein.

25. Respondent is without sufficient information to either admit or deny the allegations in Claimant's paragraph 25, therefore the same are denied.

26. The allegations in Claimant's paragraph 26 are admitted.

27. The allegations in Claimant's paragraph 27 are admitted.

28. The allegations in Claimant's paragraph 28 are admitted.

29. The allegations in Claimant's paragraph 29 are admitted.

30. The allegations in Claimant's paragraph 30 are admitted.

31. The allegations in Claimant's paragraph 31 are denied.

32. The allegations in Claimant's paragraph 32 are denied.

33. The allegations in Claimant's paragraph 33 are denied.

34. The allegations in Claimant's paragraph 34 are denied.

35. The allegations in Claimant's paragraph 35 are denied.

36. The allegations in Claimant's paragraph 36 are denied.

## RESPONSE TO SECOND CLAIM FOR RELIEF

37. Respondent realleges its responses to Claimants paragraphs 1 through 36 as set forth above as if the same were fully stated herein.

38. The allegations in Claimant's paragraph 38 are denied. As a further response, the Respondent treated the Claimant fairly ands honestly, as is shown by the Respondent's consent to sell the Claimant the Vehicle and treat the transaction as if the Claimant had paid the full down payment at the time of the sale, which he did not.

39.     The allegations in Claimant's paragraph 39 are denied. The Power of Attorney executed by the Claimant at the time of sale was limited to the process of completing the transfer of title through the North Carolina Department of Vehicles. The said Power of Attorney could be used for no other purpose and was, in fact, used for no other purpose.

40.     The allegations in Claimant's paragraph 40 are denied.

41.     The allegations in Claimant's paragraph 41 are denied.

## RESPONSE TO THIRD CLAIM FOR RELIEF

42.     Respondent realleges its responses to Claimants paragraphs 1 through 41 as set forth above as if the same were fully stated herein.

43.     The allegations in Claimant's paragraph 43 are denied.

44.     The allegations in Claimant's paragraph 44 are denied.

45.     The allegations in Claimant's paragraph 45 are denied.

46.     The allegations in Claimant's paragraph 46 are denied.

47.     The allegations in Claimant's paragraph 47 are denied.

48.     The allegations in Claimant's paragraph 48 are denied.

49.     The allegations in Claimant's paragraph 41 are denied.

50.     The allegations in Claimant's paragraph 41 are denied. As a further response, this statement is made by either the Claimant, or legal counsel, without any basis of support in an attempt to engage in a "fishing expedition" through the sales records and customer files of the Respondent in the hopes that he can locate any shred of evidence to support their false claims against the Respondent.

51.     The allegations in Claimant's paragraph 51 are denied.

## RESPONSE TO FOURTH CLAIM FOR RELIEF

52.     Respondent realleges its responses to Claimants paragraphs 1 through 50 as set forth above as if the same were fully stated herein.

53.     The allegations in Claimant's paragraph 53 are admitted.

54.     The allegations in Claimant's paragraph 30 are admitted.

55. The allegations in Claimant's paragraph 55 are denied.

56. The allegations in Claimant's paragraph 56 are denied.

57. The allegations in Claimant's paragraph 57 are denied.

## COUNTER-CLAIM

1. Respondent realleges its responses to paragraphs 1 through 57 of Claimant's Demand For Arbitration, as set forth above as if the same were fully stated herein.

2. Claimant's Demand For Arbitration does not state a claim which would be recognized under the laws of North Carolina and, therefore, constitutes the filing of a frivolous claim for an improper purpose.

3. Respondent is entitled to an award against the Claimant in an amount equal to the reasonable attorney fees incurred by the Respondent.

4. Respondent is entitled to an award against the Claimant in an amount equal to the arbitration filing fee paid by the Respondent, along with any fees which have accrued and are owed to the arbitrator assigned to this arbitration.

This the ____22____ day of June, 2017.

STRICKLIN LAW FIRM, P.A.

By:_____

Bobby J. Stricklin
Attorney for Respondent
NC Bar No. 14326
448 Westbrooke Shopping Center
Havelock, North Carolina 28532
(252) 447-1064

## CERTIFICATE OF SERVICE
### FILE NO:

I, Bobby J. Stricklin, counsel for Defendant Finance Source, LLC d/b/a Karmike USA, do hereby certify that a copy of the Answer was served upon counsel for Plaintiff by mailing a copy thereof, postage prepaid, sealed in a secure envelope and deposited in the United States Post Office, Havelock, North Carolina, on the _22_ day of November, 2016 and addressed to:

> J. Matthew Norris
> Attorney at Law
> P.O. Box 1318
> Wake Forest, NC 27588

Witness my hand this _22_ day of June, 2017.

STRICKLIN LAW FIRM, P.A.

By: _____

Bobby J. Stricklin
Attorney for Respondent
448 Westbrooke Shopping Center
Havelock, North Carolina 28532
(252) 447-1064

VERIFICATION
FILE NO: 16 CVD 1633

NORTH CAROLINA
CRAVEN COUNTY

MICHAEL J. DEMARIA, a Manager of Respondent Finance Source, LLC d/b/a Karmike USA, being duly sworn, deposes and say:

That he is a Manager of the Respondent in the foregoing action; that he has read the foregoing Response to Arbitration Demand and that the contents of said Response to Arbitration Demand are true to his own knowledge, except as to those matters stated on information and belief, and as to those matters he believes them to be true.

MICHAEL J. DEMARIA, Manager

Sworn to and subscribed before me this the 22 of June, 2017.

Notary Public



JAMS REF. 1440005277

| | |
|---|---|
| JOSEPH TROY KESLAR, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| FINANCE SOURCE, LLC, | ) |
| d/b/a KARMIKE USA, | ) |
| | ) |
| Respondent. | ) |

## RESPONDENT'S POST-ARBITRATION MEMORANDUM

Submitted December 22, 2017

Ron D. Medlin, Jr.
Ennis, Baynard, Morton, Medlin & Brown

1

## TABLE OF CONTENTS

1.  Introductory Statement……………………………..p. 3

2.  Truth In Lending Act Claim………………………p. 7

3.  Chapter 75 Claim, Good Faith and Fair Dealing…p. 14

4.  Fraud and Punitive Damages………………………p. 18

5.  Conclusion…………………………………………...p. 23

2

Respondent submits the following Post-Arbitration Memorandum requesting a ruling in favor of Respondent on all claims and requests costs and attorney's fees from the Claimant.

## Introductory Statement

Claimant's entire cause of action is based upon the premise that the price used by third-party websites was a binding price for the Respondent and can be used to compare that price to actual sales price to contend that prices have been raised as a result of financing. This analysis has numerous errors as the price used by these third-parties and placed out into the public was listed in the Dealer Socket documents as the "promo price" not the "asking price". Despite testimony from the Respondent's representatives that it intended that promo price to be the internal low price in the system, the Claimant has continued to pursue this cause of action attempting to swap the "promo price" for the "asking price". It is the sworn testimony of both Mr. Demaria and Mr. Claussen that their understanding of the promo price in the Dealer Socket system is an internal low price and not a price that was decimated to the public. It was only after dealing with Dealer Socket representatives and the facts as they arose in this case that the Respondent realized that online advertisers had been improperly using the promo price and not the asking price.

All this case has revealed is a disconnect between the Dealer Socket system and Respondent's understanding of how that system worked. At the first hearing of this matter, Mr. Demaria defined the promo price to be the internal low price available only to employees of the Respondent. However, this definition was not the same as the definition provided by Dealer Socket at the second hearing of this matter. Prior to the hearing, no one from Dealer Socket had ever educated anyone affiliated with the Respondent on this definition. The Respondent has

3

since learned that Dealer Socket authorizes the use of this promo price. As a result of this revelation, the Respondent has taken steps to correct the problem. Therefore, this entire cause of action is born not by any intentional conduct or wrongdoing on the part of the Respondent but by confusion in how the Dealer Socket system works. As stated by the Claimant's witness, the representative from Dealer Socket, the dealer has "no control" over which price is used by the online advertisers. In addition, the online advertisers can choose which price to pull and can show multiple prices on their website with no knowledge from the dealer as to which price would be used. Furthermore, there was no education or training provided to Respondent's representatives on how the Dealer Socket system worked. Plaintiff's witness from Dealer Socket could not point to any training or definition provided to Respondent as to what was meant by the "promo price" and how it would be used. Furthermore, there is no place in the Dealer Socket system for a bottom line internal price. It is confusing that on one page they refer to this as the "promo price" and on another page they call it "ask price low".

The average person dealing with this system in plain English would assume that the asking price is the price that will be asked of the public to purchase the vehicle. That is precisely how Respondent interpreted the term "asking price" and believed that the asking price would be the only price used by online advertisers provided to the public. Thus, the only logical way to analyze this case is to use a comparison of the asking price to the sales price not the undefined, confusing and burdensome term "promo price." Claimant asks that Arbitration issue a decision that would decide that Respondent is untruthful but there is absolutely no evidence of lack of truthfulness.

There is no better evidence of a failure and confusion in the Dealer Socket system than the Claimant's own evidence which shows that the only online price provided in this matter is a

4

printout obtained by Plaintiff's counsel on November 3rd, 2016 showing a "list price" of $5,995. This "price" was available on the internet seven months after the vehicle was sold to Mr. Keslar. Clearly, using online advertising in an attempt to bind Respondent is problematic as the online advertisers are using unauthorized prices on vehicles that have already been sold. At best, Claimant has proven that Respondent was ill-informed in the operation of the Dealer Socket system, a problem that has been corrected. However, this does not create a valid cause of action in this case for intentional conduct on the part of Respondent. Therefore, Respondent submits that the analysis in this case can only be performed using what was intended which is that the *asking price* be the starting value of price for the vehicle in this case and other vehicles that have been produced by Respondent.

In the first sentence of Claimant's brief, he states that Respondent uses a "bait and switch advertising strategy targeting subprime customers". However, this is not a conclusion supported by any fact or evidence in this case. To the contrary, there has been no evidence of an advertising strategy, targeting, or bait and switch. All that has been shown is that online advertisers have been using the promo price without the knowledge of the Respondent and at times what was considered to be the internal low price is higher than the actual sales price of the vehicle. Furthermore, Plaintiff's entire case is premised upon a price on the "Auto Trader" website obtained seven months after the sale of the vehicle.

A review of Auto Trader's website reveals a Visitor Agreement that creates overwhelming obstacle for Claimant's claims. Exhibit 5 of the Respondent's materials for the arbitration hearing has the Auto Trader Visitor Agreement. In that agreement it states that the material is for "general information purposes only". It goes on to state, "While we aim to provide a site that is useful, be mindful that the Auto Trader site may, from time to time, contain

5

errors." Further it states, "We make no guarantees regarding the accuracy, completeness, timeliness or reliability of any of the materials or information on the Auto Trader site, and you should not rely on it without independent verification." Further, the Visitor Agreement contains the language, "The price and other terms of sale remains subject to direct negotiation between the buyer and seller." Finally it states, "Before purchasing a vehicle or any other good or service that you have read about on the Auto Trader site, you should confirm with the seller any information including the price that is important to your purchasing decision." Thus, the Auto Trader's Visitor Agreement, which is the site relied upon by the Claimant, contains language that its information may be incorrect and should not be relied upon. Part of the agreement between Auto Trader and Dealer Socket is that there is no guarantee for the accuracy of the information. Based upon this language, to then use this information as a method with which to pursue the Respondent in this case would be erroneous and cuts against the very language that Auto Trader puts out to the public. Simply put, Auto Trader states to consumers that consumers should not rely on the information in its website for any reason but should only rely on the information that comes directly from the seller.

The Claimant in this case cannot point to a single time at which a representative of the Respondent directly quoted a price that was lower than the price in which he actually paid. Therefore, the document that is marked as Claimant's Exhibit 1 in his materials as the price information is invalid, inaccurate and has been stated by the person providing that information that it should not be relied upon.

As a threshold matter, it must be discussed what the burden of proof is for Claimant's claims in this matter. The claims sound in fraud, unfair and deceptive trade practices, and request punitive damages. Further, Claimant claims in his post-arbitration submission on page

6

10 that he has met his burden of proof by "clear and convincing" evidence. The burden of proof that Claimant must meet is the clear and convincing standard. In claims for punitive damages, the courts of the State of North Carolina have held that punitive damages are only available if a Claimant has proven the elements of its claim by "clear and convincing evidence" Hudgins v. Wagoner, 204 N.C.App. 480, 694 S.E.2d 436 (2010). Further, this same standard has been applied to unfair and deceptive trade practices claims. Jacobson v. Walsh, 2014 WL 266, 354 (NC Business Court, Unpublished Opinion, 2014). Thus, the Claimant must prove his case by clear and convincing evidence not simple propondence of the evidence in order to recover the damages sought.

## Truth in Lending Act Claim

Claimant in attempts to bring forth a Truth in Lending Act (TILA) claim by stating that the difference between the $5,995 price on Auto Trader was increased to $8,143.51, the ultimate price of the vehicle, is a hidden finance charge in violation of the TILA. However, the review of the facts of this case and the applicable case law established that this is not a TILA violation. This alleged increase only exists if the ultimate purchase price is compared to the "promo price" discussed above which was an unauthorized item pulled from Respondent's website for which Respondent had no control and no knowledge at the time of the sale. There is no better evidence of this than the testimony of Mr. Keslar himself when he testified at the hearing that he never mentioned to representatives of the Respondent that he saw a price of $5,995 online.

As testified to by Mr. Demaria and Mr. Claussen, prices of vehicles can change periodically based upon additional work that is performed, market fluctuations as well as changing locations of the vehicle. The vehicle at issue in this case did change locations which

7

explains the price change. There is no evidence the Respondent provided to Claimant a price below what he paid at any time during this transaction. Mr. Keslar admitted that no one from the Respondent ever quoted him a $5,995 asking price that he supposedly found on his girlfriend's cell phone prior to purchase. He also did not raise this issue to the Respondent. In addition, Mr. Keslar has never produced any cell phone records, screen shots or documentation of any kind establishing that he actually saw a $5,995 price on the date of the sale. In fact, Claimant has brought no evidence of any $5,995 price except the printout generated by Plaintiff's counsel seven months after the sale. For that reason, an essential element of the Claimant's claim is missing which is establishing that the Respondent quoted a lower price at the time of sale.

"Regulation Z" also known as 12 CFR § 226.1 states that "The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs". Claimant claims that Respondent failed to make a meaningful disclosure. However, this statement is contrary to all of the documents provided both to and by Mr. Keslar. The Proposal to Mr. Keslar that was agreed upon has the vehicle price, down payment, trade-in value and payment. Further, the Buyer's Order/Purchase Order, the Retail Installment Sale Contract and all other documents executed commensurate with the sale contain the exact terms of this transaction. There is no hidden finance charge and the documentation executed at the time of this sale meets the purpose of the statute which is informed use of consumer credit. If Mr. Keslar's testimony is to be believed, he made an informed decision on the date of sale and therefore the purpose of the Act was met. There is no evidence of misrepresentation on the part of the Respondent and there is no evidence of the Respondent ever providing Mr. Keslar a price below what he ultimately paid.

8

Claimant relies on several cases in an attempt to make an argument to the contrary. However, none of these cases are applicable; in fact these cases serve to eliminate the Claimant's TILA claim. For example, Claimant relies on the case of <u>Diaz vs. Paragon Motors of Woodside, Inc.</u>, 424 F.Supp.2d 519 (2006) in support of its claim. However, <u>Diaz</u> has little if any application to the case at bar. In <u>Diaz</u>, the advertised price was a newspaper advertisement purchased by the Defendant with a price lower than what the Plaintiff was ultimately charged. <u>Id</u>. at 523. Further, the Plaintiff told the seller of the advertised price and the seller refused to sell at that price due to the fact that the Plaintiff was seeking financing. <u>Id</u>. at 525. This is to be contrasted with the case at bar where the so called "advertised price" was not a price advertised by the Respondent at all but was a price that was an unauthorized lift from the Respondent's Dealer Socket account without its knowledge. Furthermore, the court in <u>Diaz</u> noted, "Thus in order to prevail on her claim that [defendant car dealer] failed to disclose this hidden finance charge, [plaintiff] "must demonstrate a "causal connection" between the higher price and the extension of credit"". <u>Id</u>. at 530, <u>citing</u>, <u>Kilbourn v. Candy Ford-Mercury, Inc.</u>, 209 F.R.D. 121, 129 (W.D. Mich. 2002).

In the case at bar, Claimant has not established any kind of causal connection in the difference between the $5,995 price and the $8,143.51 related to the extension of credit. They have simply shown a price difference between the unauthorized price found on an Auto Trader website seven months after the sale and the actual vehicle sales price without any explanation for the difference. It is the Claimant's responsibility to show the causal connection and they have not done so and for this reason the TILA claim must fail.

In addition, Claimant's reliance on <u>Gibson v. Bob Watson Chevrolet-Go, Inc.</u>, (112 F.3d. 283 (7th Cir. 1997)) is also misplaced. The <u>Gibson</u> case was a class action that had 15 identical

9

class actions consolidated amounting to hundreds of buyers. Id. It contained a contention that warranty prices were increased when subprime lending was sought. The Defendants did not deny this conduct in Gibson but claimed that their conduct was authorized under the TILA. Gibson has no application to the case at bar as Gibson had mark ups of a warranty and involved hundreds of claimants. Further, the argument in Gibson was that the price markup was "hidden" in the warranty charge. The facts in the case at bar are completely different in that the alleged price increase is of the vehicle price; something that is not hidden at all but is contained on nearly every document voluntarily signed by the Claimant.

In addition, Claimant relies on the case of Cornist v. B. J. T. Auto Sales, Inc., (272 F.3d 322 (6th Cir. 2001)) in an attempt to support its position. To the contrary, an analysis of the Cornist case reveals the fatal flaws with Claimant's TILA claims. In Cornist, it was determined that a TILA claimant must show that the price was raised "solely because he was a credit customer". Id.at 327, See also, Lester v. Wow Car Co. Ltd., 2014 W.L. 1267014 (US Dist. CT. S. D. Ohio 2014). Further, in order to establish a TILA claim, a claimant must show a "consistent pattern of differential pricing". Cornist at 329 See also, Lester at 3. Thus, under the cases cited by Claimant, Claimant must establish that financing was the sole reason for the alleged price increase. This has not been established and was denied by sworn testimony of the Respondents. Furthermore, despite Claimant's exhaustive attempts at discovery and analysis they have not shown a systematic scheme of price mark ups for credit but have only revealed five of the seventy-four vehicles sold above the asking price, none of which had an increase due to financing. If Claimant's own figures are used it only shows 29% of 74 vehicles having a sale price higher than the misused "promo price" with no explanation that it was done for financing.

10

This is far from the systematic requirement under <u>Cornist</u> and <u>Lester</u>. A comparison of the <u>Cornist</u> case to the facts at bar eliminates the Claimant's TILA claim.

Both <u>Gibson</u> and <u>Cornist</u> have prices increases in the form hidden markups of warranty, dock fees and service agreement. The TILA requires *disclosure*. The Claimant is claiming that the price was hidden like in <u>Gibson</u> and <u>Cornist.</u> However, there was nothing hidden in the documents relating to the sale of this car, in accurately spells out the details of the transaction and has no hidden fees. The details of the transaction were open and obvious and accepted by the Claimant and therefore cannot be a basis for a TILA claim.

Claimant attempts to make an argument that there is a pattern of practice for the Respondent of marking up vehicles when a purchaser asks for credit. However, the Claimant has completely failed to establish this fact despite numerous attempts. Despite exhaustive discovery, subpoenas, multiple layers of document production and hundreds if not thousands of pages of documents, Claimant has established no pattern. In fact, only 5 out of 74 vehicles were sold for greater than the asking price. One of those had negative equity, three needed additional work and there was only one vehicle out of 74 for which Respondent could not establish the reason for the increase. (See Testimony of Mike DeMaria). Keep in mind, the Claimant must establish that the reason was "solely because of financing". <u>See</u>, <u>Gibson</u>. Even Claimant's own witness, Brian Pacilli, admitted that his final purchase price was less than the asking price. It is important to note that in Claimant's brief they abandoned the Pacilli transaction and now attempt to reference a new transaction, one of a Henry Ray Guthrie. Mr. Guthrie was never mentioned in the proceedings in this matter. The vehicle purchased by Mr. Guthrie required $500 in additional work as evidenced by Mr. DeMaria's chart and that tracked exactly with the $500 price increase. (See attachments to 11/28/17 email from Ron Medlin to Carlton King.)

In light of Claimant's complete failure to establish a pattern, Claimant attempted to shift gears and make an argument based upon how Respondent handles negative equity. This is revealed in section B. iii. Of the Claimant's brief. Not a single customer, lender or anyone has provided testimony regarding this practice or taken exception to it, only Claimant's counsel Mr. Norris. Claimant did not have a trade-in in this case and therefore any argument that negative equity could create some sort of a "pattern" that applies to Mr. Keslar is a futile argument. The fact that Claimant has attempted to make this case about how negative equity is shown on the Retail Installment Sales Contract illustrates the futility of the Claimant's pattern and practice claim. Claimant could not prove what they wanted to prove despite exhaustive discovery which is a pattern of practice of increasing the sale price when a consumer asks for financing. In fact, based upon the transactions they have proven exactly the opposite, that the Respondent does not increase its price when a consumer seeks financing but in fact has sold 69 of 74 vehicles below their asking price, has a non-consumer credit reason for the increases on 4 of the remaining 5. In fact, Claimant's own numbers show that 71% of vehicles were sold even below the "promo price."

As stated above, the 29% figure quoted by the Claimant in his brief is without support. This is based upon using the wrong price. The analysis can only be done by using the price that the Respondent held out to the public which was the "asking price". Further, Claimant's calculation of sales is based upon a document that was excluded from evidence in the arbitration of this matter. It was an attorney generated document with analysis and comparison. Claimant, despite having Exhibit 12c excluded in the hearing of this matter, has attempted to re-visit this document in his brief. This is an attorney generated document using analysis that was not authenticated by any witness. This was created by Mr. Norris himself based upon his own

12

subjective interpretation of the facts. Mr. Norris incorrectly uses the "promo price" as the "cash price" which was not authorized at any time by the Respondent. It is interesting that Mr. Norris chose to do this despite the fact that he had a paid expert witness that could have generated a proper analysis. One can only speculate as to why he did not do so, but a logical explanation is that if the calculation was done by anyone other than counsel it would fail to show the pattern that Mr. Norris was seeking. The reliance upon this document is improper and it is the sole basis for any contention that the Respondent committed a TILA violation. Therefore, there has been no evidence of price changing due to financing. This is all based upon a price that the Respondent did not know was being quoted in the marketplace. Further, Mr. Keslar has failed to show a causal connection between the price and the extension of credit as required by Cornist.

The facts of this case are closer to the facts of the Connecticut District Court case of Frazee v. Seaview Toyota Pontiac, Inc., 695 F.Supp 1406 (1998). In that case, summary judgment for the Defendant on a TILA claim was upheld when the Plaintiff attempted to pursue a TILA claim after the car required extensive repairs and was not available for use. Id. In that case, the Plaintiff argued that the difference between the fair market value of the car purchased and the amount paid reflect a hidden finance charge. Id. at 1408. The court noted that the Plaintiff entered into a Retail Installment contract that plainly disclosed the finance charges. Id. The court determined "the car purchased by the Plaintiff did not meet her expectations and now she claims it is not worth what she paid for it; it is not actionable under the TILA. Any differential between the fair market value of the car and its cash price is attributable to a bad bargain, or perhaps a violation of the bargain in the sale of the car, and not any hidden finance charges. Defendant complied with the disclosure requirements of TILA." Id. at 1408. Similarly in this case, Mr. Keslar tried to argue that he paid higher than the market value of the vehicle.

13

He then also tried to argue that he paid higher than a price that was unauthorized and located on a website which he claimed he viewed but was not discovered until seven months after the sale of the vehicle. Mr. Keslar had mechanical difficulties with the car and attempted to trade it in and when he was unable to do so only at that point claimed that he somehow was given a hidden finance charge. To the contrary, he was given the interest rate shown in the retail installment sales contract, the price shown in the contract and all of the necessary information for the sale. This transaction was fully disclosed and the Claimant's claim is more attributable to his dissatisfaction with a bad bargain than a TILA violation. For the above reasons, Plaintiff has failed to establish, as a matter of law, a TILA violation.

## Chapter 75 Claim, Good Faith and Fair Dealing

Both claim 2 and claim 4 contained in the Claimant's Demand for Arbitration are actually a re-statement of a Chapter 75 Unfair and Deceptive Trade Practices Claim. There was nothing unfair and deceptive about this transaction. All the price information, interest rate and payments were fully disclosed and nothing deceived the Claimant or was unfair. The actions of the Respondent do not give rise to a Chapter 75 claim. The only thing that can be perceived as "deception" came from the use of an unauthorized price by a third-party which cannot be attributable to the Respondent. Mr. Keslar did not care about the asking price but only cared about his payment and he obtained the precise payment he wished. However, the Claimant now claims that a purchase that he was unhappy with after he encountered mechanical defects and could not trade-in the vehicle was unfair and deceptive. The cash price was never increased and in fact this vehicle had a decreased price during the negotiation. The elements of an Unfair and Deceptive Trade Practice claim are: "1) An unfair and deceptive act or practice, 2) In or effecting

14

commerce, and 3) Proximately caused actual injury to the [claimant]." Spartan Leasing v. Pollard, 101 N.C.App. 450, 400 S.E.2d 476 (1991). The courts have defined unfair and deceptive acts or practices as acts that are ones that are "immoral, unethical, oppressive unscrupulous or substantial injurious to consumers." See, Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397 (1991). Further, the North Carolina Business Court has stated that "The North Carolina General Assembly did not intend the act to apply to the internal conduct to a single business." Jacobsen v. Walsh, 2014 W.L. 266354 (Mecklenburg County Superior Court 2014) citing, Murray v. Nationwide Mut. Ins. Co., 123 N.C.App. 1, 9, 472 S.E.2d 358, 362 (1996). The Respondent's actions in this case were not illegal but even if taken in a light favorable to the Claimant, fall short of the necessary standard of immoral, unethical, oppressive, unscrupulous or substantially injurious. Simply put, these are actions involving a single buyer and seller and the Claimant's attempt to expand this action and show other transactions has failed on its face as discussed above. Chapter 75 claims were never meant to be used for "single deals" but were meant for a pattern of practice which has not been established by the Claimant.

In support of the Claimant's position, he relies on the Herbies case which is appendixed to his brief. This case has no application to the case at bar. It is an administrative proceeding which has no binding precedent on this forum. Further, an administrative proceeding is a proceeding by a regulatory agency directly against the dealership and that is a contrast from the case at bar. In addition, the dealership in the Herbies case had conduct that was in no way similar to the conduct of Respondent despite the suggestion by Claimant. The dealership in Herbies would not tell the customer of any price until after the deal was struck. They had a company policy of not negotiating with credit consumers; they forced on credit consumers a repair warranty, a GPS payment reminder and charged them for the same. Furthermore, the

15

course of conduct took place with multiple consumers from January 2012 to May 2014. That is dissimilar to the case at bar where there are no additional warranties, GPS or other items forced on Mr. Keslar and Mr. Keslar's price actually dropped during negotiation and therefore it established that Respondent negotiated with Mr. Keslar unlike the dealership in Herbies. Herbies is not applicable to this case.

Further, Claimant's brief cites the case of In re Fifth Third Bank Nat. Ass'n-Village of Penland Litigation, (217 N.C.App. 199, 719 S.E.2d 171 (2011)) for the position that a violation of the Truth in Lending Act is a per se violation under Chapter 75. However, this is a complete misstatement of the holding of Fifth Third Bank. Specifically, the Fifth Third case states that a violation of a regulatory statute *may in some circumstances* also be a violation of Chapter 75. Fifth Third at 207, 719 S.E.2d at 176. Further, the court actually noted "While such a regulatory violation may offend N.C. Gen. Stat. 75-1.1, the violation does not automatically result in an Unfair and Deceptive Trade Practice under that statute... for that reason a violation of a consumer protection statute *may*, in some instances, constitute a per se violation of the UDTPA." Id. (emphasis added). The court went on to determine that in Fifth Third that "a violation of internal business policies and general industry standards does not constitute a per se violation of the UDTPA." Id. at 209, 719 S.E.2d at 178. Thus, the Plaintiff's claim that a Chapter 75 claim is automatic if Claimant can prove the TILA claim is without merit and is not supported by the case law of the State of North Carolina. To the contrary, Claimant must prove by clear and convincing evidence unscrupulous, unethical, immoral and oppressive behavior on the part of the Respondent and the evidence in this case is simply not there.

It is problematic for the Claimant to maintain that the Respondent' misunderstanding of how online advertisers would pull information from the Dealer Socket system amounts to

16

conduct that is unfair, unscrupulous and oppressive. In fact, the evidence this case suggests that the fact that the promo prices ended up on the website was accidental and based upon a misunderstanding not an attempt to engage in oppressive conduct. This is especially true when you consider that the Claimant got the precise payment he wanted and was initially satisfied with the transaction. Further, the details of the transaction are fully disclosed in the sale documents. The entire case against the Respondent is based upon an attempt by the Claimant to try to saddle the Respondent with information provided not by the Respondent but by third-parties, without permission, by pulling a price that the Respondent believed was an internal number. As stated above, the Dealer Socket system is clearly burdensome and confusing and suffers from a lack of training and understanding. As stated by Claimant's own Dealer Socket witness, Respondent had no control over which price was taken by online advertisers and was given no education on how this system would operate. This is far from clear and convincing evidence of oppressive and unscrupulous conduct.

Further, Claimant's argument that removal of pricing from the website is evidence of unfair and deceptive conduct is misplaced. Claimant believes that by removing the unauthorized prices from the internet, the Respondent is engaging in further oppressive and unscrupulous conduct. This could not be further from the truth. Respondent was simply trying to correct the problem in the Dealer Socket system that led to erroneous prices being disseminated. In fact, the post-discovery actions of the Respondent are an indication that the Respondent never intended the promo price to be provided to the general public.

Claimant requests that you ignore the testimony of Mr. Demaria and Mr. Claussen based upon Claimant's subjective skepticism. However, Claimant has done nothing to contradict or impeach but simply asks that the arbitration panel choose to disbelieve Respondent's witnesses.

17

Respondent requests that this panel look at the weight of the evidence and their testimony as well as the fact that Claimant has offered no direct evidence to disprove their statements. For these above reasons, Claimant has failed to establish unfair, oppressive and unscrupulous conduct giving rise to a Chapter 75 claim. Claimant has simply shown a singular transaction where the vehicle was sold at a higher price than listed on the internet without the Respondent's knowledge. Further, as discussed above, no pattern or practice of this conduct has been established despite exhaustive discovery and attempts by the Claimant.

## **Fraud and Punitive Damages**

The final cause of action brought forth by the Claimant is a claim for fraud and punitive damages. An action for fraud has the following elements:

1. False representation or concealment of material fact;

2. Reasonably calculated to deceive;

3. Made with intent to deceive;

4. Which does in fact deceive;

5. Resulting in damage to the injured party

Johnson v. Owens, 263 N.C. 754, 140 S.E.2d 311 (1965). These elements are missing from this case. Claimant attempts to use the Everhart case. Everhart v. O'Charley's, Inc., 200 N.C.App 142, 683 S.E.2d 728 (1999). However, Everhart involved a customer being poisoned dining at the Defendant's restaurant and the defendant's failure to discover what the Plaintiff had been served. Id. These facts are inapplicable to the case at bar and bare no relationship to this case.

On the elements of fraud, there was no false representation in this matter. Claimant admits that he was initially given a price of $8,495 which was later reduced to $8,143.51. He

18

negotiated a lower price to obtain his requested monthly payment. There was no deception there. There was also no evidence of any kind of scheme to deceive. There was no establishment of any intent to deceive the Claimant. To the contrary, all that has been shown is confusion by the Respondent by how the Dealer Socket system worked. The Claimant was not deceived and knew the full facts of the transaction and entered the transaction voluntarily. In fact, if you believe the Claimant's testimony, he was aware of the price on Auto Trader before he ever negotiated the deal and took no issue with the higher asking price because his payment was met and he was fine with the transaction. Thus, any argument of deception would fail. In fact, he did not claim any deception until he was unhappy with the mechanical problems with the vehicle and his inability to trade it in. Claimant was not deceived. This argument is based upon the false premise that the price was increased but there has never been an increase above the *asking* price of the vehicle. There has been no evidence of intentional or deliberate intent to deceive and Claimant's fraud and punitive damages claim must fail as the necessary elements have not been proven by clear and convincing evidence.

Much of Claimant's cause of action is based upon is attempt to record a phone call with Marcus Claussen. To use a single recorded phone call of a manager during a busy day after multiple harassing phone calls as an official statement to bind the Respondent would be an error. This phone call was a set up done at the prompting of counsel and recorded without the knowledge or permission of Mr. Claussen. As stated in the testimony by both Keslar and Claussen, there were multiple prior phone calls. However, Claimant did not produce a recording of any of these other phone calls. These were leading questions with items missing from the transcription. When taken as a whole, the only reasonable interpretation of Mr. Claussen's statement is that the Claimant may have obtained a better deal if he had paid with cash.

19

However, there is nothing wrong with giving a cash customer a better deal; it is only problematic if the price is increased *because of* financing. This statement is not contained in the recording of Mr. Claussen and this is an important distinction.

Claimant attempts to use a misapplication of case law to place an unsworn incomplete transcript of one of numerous conversations ahead of sworn testimony at the arbitration hearing. This is based upon Claimant's misinterpretation of <u>Wilson v. Gaston County, NC</u>, 685 Fed.Appx. 193 (4th Cir. 2017) and <u>Stephenson v. City of Seat Pleasant</u>, 743 F.3d 411 (4th Cir. 2014). Claimant claims that Mr. Claussen's sworn testimony is a "sham affidavit" and that his testimony should be excluded and the unsworn partially recorded conversation should take its place. However, these are motion for summary judgment cases where the decision is whether the contrary statements create an issue of fact. These cases and have no applicability to the equivalent of trial testimony. Sworn testimony at the hearing should be given more weight than Mr. Keslar's cell phone recording. Further, to take the Keslar recording as evidence takes items out of context. To allow Plaintiff to rely on the recording would be allowing the Plaintiff to move forward after having spoilated that evidence of the full conversations with Mr. Claussen. As admitted by Mr. Keslar, he had numerous conversations with Mr. Claussen but failed to produce a recording of any of those conversations but simply cherry picked the one conversation he wanted with direct questions given by his counsel in an attempt to cross-examine a clearly frustrated and busy Mr. Claussen.

Thus, the Claimant has spoilated the other conversations and the taped recording should be excluded and not considered. In <u>McLain v. Taco Bell Corp.</u>, 137 N.C.App. 179, 527 S.E.2d 712 (2000) the North Carolina Court of Appeals noted that "where a party fails to introduce into evidence documents that are relevant to the matter in question and within its control...there is a

presumption or at least an inference that the evidence withheld, and forthcoming, would injure his case." McLain at 183, 527 S.E.2d at 715 quoting, Yarborough v. Hughes, 139 N.C. 199, 51 S.E. 904 (1905). Therefore, the Claimant's failure to produce the recordings of all conversations between Mr. Claussen and Mr. Keslar is a spoliation of evidence and the Respondent is entitled to an inference from this arbitration forum that the other conversations would have supported Mr. Claussen's testimony at the arbitration hearing.

Similarly, the Claimant's attempt to bring in a so-called expert witness that spoke about industry standards but not legal standards is not binding to this case. Claimant attempted to cleverly couch legal questions in the form of "industry standards". At best, Ms. Messenger can only show that the Respondent's practices may be different than some other dealerships. She spoke primarily about the irrelevant issue of negative equity but can only speak to industry standards not legal violations and therefore her testimony is useless to the analysis of this case. Claimant must produce clear and convincing evidence that Respondent intentionally violated the law and Ms. Messenger falls short of any statement along those lines.

Claimant cannot show a single transaction where the price was raised as a result of financing. That is what must be show by clear and convincing evidence and it has not been done. What Claimant has attempted is a smoke screen of transactions and websites in an attempt to show a non-existent pattern. The entire case is premised on information off of websites that was unauthorized and inaccurate and this is far from clear and convincing evidence. Furthermore, it makes no sense that the Claimant in fact saw the car online for $5,995 and then accepted a proposal with a price of over $8,000. What is more logical is that the first time he knew of the $5,995 price was after his attorney found it online seven months after the

transaction. Furthermore, Mr. Keslar even stated in his testimony that the $8,495 price was "the first price they gave me".

Claimant's brief asserts that documents have been withheld by Respondent. There is also a claim for spoilation when it is in fact the Claimant that has spoilated evidence in the form of recording only portions of conversations and manufactured evidence in the form of attorney generated charts as shown in Claimant's Exhibit 12c. The argument that documents have been withheld was rejected at the hearing and should be rejected now. Respondent produced thousands of pages of documents and everything that Claimant has asked for. Claimant asked for items by name and was given precisely those documents. At the initial hearing of this matter, Claimant tried to shift gears to claim that they wanted "everything". After which Respondent was compelled to produce even further documents. This was even after assurances by opposing counsel that the round of documents before that would be "all that was needed". Twice Respondent has been given assurances by Claimant's counsel that no additional documentation would be needed beyond what was being requested and twice additional documents have been demanded. To now state that items have been withheld is a misrepresentation and unprofessional in light of the history of document production in this matter.

Claimant has gone on an extensive fishing expedition over six months that has revealed absolutely nothing other than attorney generated numbers from portions of transactions. The simple fact is that all of this document production, calling customers and asking for more and more documents has only shown one unhappy customer out of the 74 deal folders produced. Further, that customer, Brian Pacilli, admitted under oath that he paid less than the asking price for the vehicle. What Claimant has failed to discuss is the other 73 customers that were happy with their transaction. Despite calling each and every one of these customers, these 73

22

customers offered no help to the Claimant. In fact, what the Claimant's fishing expedition has revealed is a pattern of satisfied customers that were treated fairly by the Respondent and this fact completely eradicates the Claimant's claim.

In actions brought under Chapter 75 of the General Statutes, the prevailing party is allowed attorney's fees at the discretion of the Court. This is one of the few areas in North Carolina law where a Defendant in an action can receive attorney's fees. Under N.C. Gen. Stat. § 75-16.1 the presiding judge may, in his discretion, allow reasonable attorney's fee to the duly licensed attorney representing the prevailing party. As stated above, the Claimant has no valid Chapter 75 claim and the should the court so determine, the Respondent requests that it be awarded a reasonable attorney's fee and costs under N.C. Gen. Stat. § 75-16.1. The Chapter 75 claim is action meets the frivolity standard under the statute.

## Conclusion

Claimant's entire case is based upon taking a consumer who was fully aware of the details of his transaction then discovering a price on the internet, months after the sale, that was lower than what the Claimant paid. Then, claimant attempts to generate a so-called "pattern". In order to find for the Claimant, the conclusion must be made that the Respondent's misunderstanding of the Dealer Socket system use of the promo price is a fabrication. Claimant wants the result of this arbitration to be that the Respondent intentionally advertised a lower price and then misrepresented the facts in the arbitration of this matter. These facts must be proven with clear and convincing evidence as this is the standard of proof. However, Claimant has not met the standard of proof. Respondent's representatives have testified and their testimony has not been contradicted and no impeachment has taken place. Claimant asks that

23

their testimony be disregarded simply because Claimant does not like it. For Claimant to win they would need to show the dealer quoted one price directly to the consumer and then raised it upon the consumer requesting financing. There is only evidence that Respondent sold the car to Claimant for a price lower than initially quoted. The Claimant's entire case based upon the unauthorized use of prices by internet advertisers combined with the misunderstanding of the Dealer Socket system does not show the pattern, practice or level of reprehensible conduct required to recover. The actions of these online advertisers cannot be imputed to the Respondent. The Claimant has not carried the burden of proof on the issues of this case and the Respondent requests that the ruling of this arbitration to be to find for the Respondent.

Respectfully submitted this the 22 of December, 2017.

**ENNIS BAYNARD MORTON**
**MEDLIN & BROWN, P.A.**

By:     /s/ Ron D. Medlin, Jr.
RON D. MEDLIN, JR.
NC State Bar No. 31682
P.O. Drawer 1327
Wrightsville Beach, NC 28480
Phone: (910) 256-3992

24



JOSEPH TROY KESLAR,

      Claimant,

      vs.

FINANCE SOURCE, LLC, d/b/a KarMike
USA,

      Respondent,

**CLAIMANT'S REPLY TO
RESPONDENT'S
POST-ARBITRATION BRIEF**

      Claimant, through counsel, submits the following Reply to Respondent's Post-Arbitration

Brief. In support thereof, Claimant respectfully shows the Arbitrator the following:

## OVERVIEW

      In reviewing the Respondent's Post-Arbitration Brief, the undersigned noticed an issue

raised in the Unfair and Deceptive Practices (UDPA) section that, in the interests of candor

and fairness, cannot go uncorrected. Claimant is aware that there is already an abundance of

information for the Arbitrator to review. However, the undersigned would be remiss if he did

not address Respondent's gross misapplication of the sole case that it cites in support of its

baseless argument that Claimant must prove a pattern and practice in order to maintain an

individual claim under Chapter 75. While it is clear that Claimant has, in fact, presented

sufficient pattern and practice evidence, he simply does not need to do so to prevail on an

individual UDPA claim. The legal authority Respondent cites is misconstrued at best and

misleading at worst. Indeed, no legal authority *whatsoever* exists in North Carolina to support

Respondent's position.

1

## ARGUMENT

I. **RESPONDENT'S ASSERTION THAT A CLAIMANT MUST PROVE A PATTERN OF PRACTICE TO MAINTAIN AN INDIVIDUAL UDPA ACTION IS SIMPLY WRONG.**

Respondent claims in its Brief that "Chapter 75 claims were never meant to be used for 'single deals' but were meant for a pattern of practice which has not been established by the Claimant." (Resp't. Br. p. 15). To support this puzzling assertion, Respondent argues that "the North Carolina Business Court has stated that 'The North Carolina General Assembly did not intend the act to apply to the internal conduct to a single business.' Jacobsen [sic] v. Walsh, 2014 W.L. 266354 (Mecklenburg County Superior Court 2014) *citing*, Murray v. Nationwide Mut. Ins. Co., 123 N.C.App. 1, 9, 472 S.E.2d 358, 362 (1996)." (Resp't. Br. at p. 15).[1] This is problematic for two reasons. First, a plain and unambiguous reading of Jacobson shows that it is factually distinguishable from this case; second, Respondent *substituted* Murray, *supra*, whole cloth, into the quoted citation. The actual citation in the Jacobson decision was White v. Thompson, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010), which pertains to UDPA claims brought by business partners against one another, and has nothing to do with a consumer claim. Not only did Respondent substitute this citation, but it failed to include, reference, or cite White at all in its Brief or attached cases and authorities.

---

1 "The North Carolina Business Court is an administrative division of the General Court of Justice. Cases involving complex and significant issues of corporate and commercial law in North Carolina are designated by the Chief Justice of the Supreme Court of North Carolina to a Special Superior Court Judge who oversees all aspects of the case from the time of designation through trial or other resolution." North Carolina Business Court Homepage, *found online at*: http://www.ncbusinesscourt.net.

2

**A. Jacobson Bears No Factual Relationship Whatsoever to This Matter, as the Plaintiff there was the Defendants'** *Business Partner,* **and His Claims Arose From Defendants' Conduct in that Business.**

Jacobson could not be more unrelated to the facts of this case. In Jacobson, the Plaintiff and Defendants were *business partners,* having set up "an LLC with the three of them as members." Jacobson, at p. 2, ¶ 14. The business was set up to allow the parties to engage in various real estate transactions. Id. When the transactions went south, Plaintiff sued his own business partners, alleging, among other things, breach of fiduciary duty, breach of contract, fraud, and unfair and deceptive practices. Id. at p. 1, ¶ 5.

The Court, in dismissing the UDPA claim, did state that the Act did not apply to the internal conduct of a single business." Id. at p. 7, ¶ 48. However, it explained the basis for its decision to dismiss the claim only four paragraphs later:

> "Plaintiff and Defendants were **involved in a joint venture** to invest in and develop real estate. All transactions at issue occurred between the parties and **did not affect any consumers** in the real estate marketplace. Accordingly, the Court concludes that the transaction **was not "in or affecting commerce"** as required by N.C.G.S. § 75-1., a fatal deficit for Plaintiff."

Jacobson at p. 7, ¶ 52 (emphasis added). Thus, the plaintiff's claim was dismissed because the plaintiff and defendants were in business together, and the claims arose from the defendants' alleged conduct in that business *against the Plaintiff.* It had **nothing to do with a business-to-consumer transaction**.

3

**B. Respondent Changed the Citation in its Brief from <u>White</u>, the Actual Case Cited in <u>Jacobson</u>, and Did Not Include it in its Cases and Authorities. A Plain Reading of the <u>White</u> Case Destroys Respondent's Argument.**

Simply misreading a case is one thing; substituting cited authority with a completely different case is another entirely. The actual line quoted by Respondent does not cite <u>Murray</u>[2] at all:

> "The North Carolina General Assembly did not intend for the Act to apply to the internal conduct of a single business. <u>White v. Thompson</u>, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010)."

> <u>Id.</u> at ¶ 48.

Whatever the underlying reason for Respondent's decision to change the citation and omit the White case entirely, the *opening paragraph* of the decision might provide some insight:

> "This case presents the question whether the General Assembly intended unfair or deceptive conduct **among business parties contained solely within a single business** to be 'in or affecting commerce' such that a **partner's breach of his fiduciary duty owed to his fellow partners violates North Carolina's unfair and deceptive practices act** ("the Act"), N.C.G.S. § 75-1.1. With the Act our General Assembly sought to prohibit unfair or deceptive conduct in interactions between different market participants. The General Assembly **did not intend for the Act to regulate purely internal business operations**. In the present case the breaching partner's unfair conduct **was solely within a single partnership**. Accordingly, we hold that **his action is not "in or affecting commerce"** as that term is used in N.C.G.S. § 75-1.1 and that such conduct is therefore not a violation of the Act.

> <u>White</u>, 364 N.C. at 47 (emphasis added). There is simply no way to read <u>White</u> to support the claim Respondent makes in its Brief. Respondent's reliance on <u>Jacobson</u> to stand somehow for the puzzling proposition that "Chapter 75 claims were never meant to be used for 'single deals'

---

2 It is also worth noting that Respondent also omitted the <u>Murray</u> case in its index of authorities. In case the Arbitrator finds it necessary to review, Claimant has attached it hereto. Needless to say, <u>Murray</u> does not support Respondent's argument in the slightest.

4

but were meant for a pattern of practice…" (Resp't Br. p. 15) is woefully misplaced. Indeed, the fact that the best that Respondent could do to support its assertion was to misconstrue an obscure and unreported Business Court decision with zero precedential value shows that its argument is completely devoid any legal merit and should be rejected as such, along with the rest of Respondent's arguments.[3]

## CONCLUSION

For the foregoing reasons, and those set forth in Claimant's Post-Arbitration Brief, Claimant respectfully requests that the Arbitrator enter an award in his favor.


This the **23rd** day of December, 2017.

NORRIS LAW FIRM, PLLC

By:    */s/ Matt Norris*
        J. Matthew Norris
        NC Bar No. 37206
        P.O. Box 1318
        Wake Forest, NC 27588
        Telephone: (919) 981-4475
        Facsimile: (919) 926-1676
        Email:  matt@lemonlawnc.com
        *Counsel for Claimant*

---

[3] For further guidance on this issue, Claimant refers the Arbitrator to the attached "Model" North Carolina Pattern Jury Instruction for a Chapter 75 Claim. N.C.P.I. 813.05. Coincidentally, this jury instruction derived from a North Carolina Supreme Court case, Hardy v. Toler, 288 N.C. 303, 218 S.E.2d 346 (1975), which involved a "single deal," in which the plaintiff alleged that the dealer defendant misrepresented whether the vehicle had been previously wrecked.

5

JOSEPH TROY KESLAR,    )
    )
    Claimant,    )
    )
vs.    )
    )
FINANCE SOURCE, LLC,    )
d/b/a KARMIKE USA,    )
    )
    Respondent.    )

## RESPONDENT'S REQUEST FOR CORRECTION OF PARTIAL FINAL AWARD

Submitted February 15, 2018

Ron D. Medlin, Jr.
Ennis, Baynard, Morton, Medlin & Brown

NOW COMES the Respondent, pursuant to Rule 19(i) of the JAMS Streamlined Arbitration Rules and Procedures and hereby requests that the arbitration panel in this case correct the error of law in its Award and set aside the award of punitive damages as it is contrary to North Carolina law. In support of its Motion, Respondent shows unto the Court as follows:

### Statement of the Facts

This matter was arbitrated before F. Carlton King, Jr. via claims made by the Claimant under the Truth and Lending Act, Chapter 75 of the North Carolina General Statutes (Unfair and Deceptive Trade Practices Act) and Chapter 1D of the North Caroline General Statutes (Punitive Damages). The Award of this case has been entered. At no time during these proceedings has Claimant chosen to elect a remedy and decide between punitive damages under Chapter 1D and

1

treble damages under Chapter 75. No remedy was elected prior to the entry of the award/final judgment of this arbitration panel.

On February 8th, 2018, the arbitration panel entered its "Interim Award" (Partial Final Award) ruling on all issues with the exception of attorney's fees. The arbitration panel found for the Claimant and awarded sums for the Truth in Lending Act claim, treble damages for the Chapter 75 claim and punitive damages. As discussed more fully below, the award of punitive damages in addition to treble damages is contrary to North Carolina law.

### Discussion

1. **North Carolina controls treble damages and punitive damages in this matter.**

Under the terms of the arbitration provision in this matter which is attached as Exhibit A and signed by Mr. Keslar, "The arbitrator shall apply governing substantive law and the applicable statute of limitations." The applicable substantive law which was moved upon by the Claimant for the claims of unfair and deceptive trade practices and punitive damages was North Carolina law. These are statutory creations in North Carolina and therefore under the terms of the arbitration agreement giving rise to this action, North Carolina law will control the analysis. As stated more fully below, the award of punitive damages in addition to Chapter 75 treble damages is not allowed under North Carolina law.

2. **North Carolina law prohibits the duplicate remedy of punitive damages and treble damages.**

As stated in the "Interim Award" (Partial Final Award), the arbitrator found the Respondent to be in violation of the North Carolina Unfair and Deceptive Trade Practices Act, Chapter 75 and trebled the damages. There is also an award of punitive damages in the sum of

2

$50,000 for the Claimant. This amounts to a duplicate remedy which is barred by case law. This issue was addressed by the North Carolina Supreme Court in the case of <u>United Laboratories, Inc. v. Kuykendall</u>, 335 N.C. 183, 437 S.E.2d 374 (1993). (This case was cited in the Claimant's Brief). In <u>United Laboratories</u>, the NC Supreme Court determined that an election of remedies is required and that an aspect of the Doctrine of an Election of Remedies is to prevent "double redress for a single wrong". <u>Id</u>. at 191, 437 S.E.2d at 379, <u>citing</u>, <u>Smith v. Oil Corp.</u>, 239 N.C. 360, 368, 79 S.E.2d 880, 885 (1954). Further, the court went on to state, "Thus a party may not recover punitive damages for tortious conduct and treble damage for violation of Chapter 75 based upon the same conduct." <u>Id</u>., <u>citing</u>, <u>Ellis v. Northern Star</u>, 326 N.C. 219, 227-228, 388 S.E.2d 127, 132 (1990); <u>Mapp v. Toyota World</u>, 81 N.C.App. 421, 426-427, 344 S.E.2d 297; <u>Marshall v. Miller</u>, 47 N.C.App. 530, S.E.2d 97 (1980). Therefore, the courts of this state have determined that when an action arises out of the same course of conduct, it is an error to award both treble damages and punitive damages. Similarly, in the case at bar, the Claimant alleged multiple statutory violations based upon a single act relating to the alleged price increase as a result of financing charge provided to Mr. Keslar. Therefore, Respondent respectfully requests that punitive damages be stricken as the duplication of punitive damages and treble damages are contrary to the holding of the Supreme Court of North Carolina in <u>United Laboratories, Inc.</u>

### 3. **Claimant made no election of remedy prior to the award.**

North Carolina law requires that a Claimant elect treble damages or punitive damages prior to the entry of the award/judgment in a case. No such election was made by the Claimant in this matter and has not been made to date. Further, any election of remedy at this point would be too late as the award has already been entered. As discussed more fully below, the courts of

Case 4:18-cv-00109-BO    Document 1    Filed 06/20/18    Page 78 of 121

North Carolina have given specific instructions on how to handle a duplicate award of treble damages and punitive damages when no election is made by the Claimant.

In the case of <u>Mapp v. Toyota World, Inc.</u>, <u>Supra.</u>, the NC Court of Appeals addressed when the election of remedy must be made by a Plaintiff/Claimant. The court in <u>Mapp</u> agreed with the position of the Defendant that a Plaintiff is not entitled to recover both punitive damages and treble damages for the same conduct. <u>Mapp</u> at 426, 344 S.E.2d at 301. Further, the court noted that a Plaintiff should be allowed to elect its remedy after the jury verdict. <u>Id.</u> at 426, 344 S.E.2d at 301. The court went on to state, "We hold that it would be manifestly unfair to require Plaintiffs in such cases to elect before a jury has answered the issues and the trial court has determined whether to treble the compensatory damages found by the jury and that such election would be allowed in the judgment." <u>Id.</u>. Thus, <u>Mapp</u> stands for the proposition that after a jury verdict but before the entry of an award/judgment, the Plaintiff may elect its remedy, punitive damages or treble damages. However, since the award of this panel has already been entered, it is too late at this stage for the Claimant to elect its remedy and this panel must turn to the case discussed below, <u>Pinehurst v. O'Leary Bros. Realty, Inc.</u>, (79 N.C.App. 51, 388 S.E.2d 918 (1986)), on how to properly address and correct an award of punitive and treble damages from the same conduct when no election of remedy is made by a Claimant.

**4. Under North Carolina law, at this procedural stage, the punitive damages award must be removed from the Interim Award**

As discussed above, the Claimant has made no election of remedies between punitive damages and treble damages and the award has been entered. The only remedy under North Carolina law at this point is to remove the punitive damages and correct the Award pursuant to Rule 19 of the JAMS streamlined rule for arbitration. The facts of this case are nearly identical

4

to the facts of <u>Pinehurst v. O'Leary Bros. Realty, Inc.</u>, <u>Supra</u>.  Further, this case is cited in the Interim Award and was available to the panel at the time the award was made.  In <u>Pinehurst</u>, a developer brought an action against a realty firm for various torts as well as unfair and deceptive trade practices.  The matter was tried without a jury and the judge entered a judgment for the Plaintiffs on the unfair and deceptive trade practices claim.  <u>Id</u>.  The trial court awarded actual damages in the amount of one dollar which typically under the statutory scheme is trebled.  <u>Id</u>.  However, the trial court made the decision to not treble the damages and instead awarded punitive damages.  The trial court noted, "Since the order of actual damages and punitive damages exceeds an award of treble of the actual damages, the actual damages will not be trebled even though the Court has found a violation of G.S. 75-1.1."  <u>Id</u>. at 56, 338 S.E.2d at 921.

The Court of Appeals, reviewing the trial court in <u>Pinehurst</u> in Section V of its opinion stated, "More significantly, whereas common law actions grounded in tort or contract *allow* both actual and multiple damages, G.S. 75-16 provides in effect that any actual damages assessed *shall* be trebled by the Court if a violation of G.S. 75-1.1 is found".  <u>Id</u>. at 62, 338 S.E.2d at 924. (This was the proposition for which this panel cited <u>Pinehurst</u> in the interim award).  However, the opinion goes on to state, "Absent statutory language making trebling discretionary with the trial judge, we must conclude that the legislature intended for trebling of any damages assessed to be automatic once a violation is shown."  <u>Id</u>. at 62, 338 S.E.2d at 925.  However, the court went on to note that based upon the procedural posture in <u>Pinehurst</u>, the treble damages, since they are compulsory,y must stand and the award of punitive damages must be stricken:

> Because of an award of treble damages under Chapter 75 is bottomed upon "private enforcement" and "punitive measure" considerations, we believe an additional award of punitive damages would necessarily be duplicative, to the extent that the treble damage award consists of a punitive element.  And we have not taken lightly Plaintiff's appealing argument that additional punitive remedy is needed for intentional egregious conduct.  The argument, considering the facts of

5

> this case, may impel legislative action to cover situations in which compensatory damages, even when treble, results in a token award. In this case, our job is not to legislate but to interpret Chapter 75 as it is written.

Id. at 62-63, 338 S.E.2d at 925. The court went on to note, "Because Section 75-1.1 is in "derogation of the common law" causes of actions for unfair and deceptive trade practices and Section 75-16 imposes a penalty, strict construction is in order. Absent explicit legislative inclusion, punitive damages should be excluded by the statutory scheme." Id. Finally, the court noted, "The award of punitive damages is vacated. The decision of the trial court and all other respects is affirmed." Id. at 65, 338 S.E.2d at 926. Thus, the Court of Appeals determined that when the Plaintiff had not elected its remedy between punitive damages and treble damages and an award of punitive damages is made in a Chapter 75 action. The award of punitive damages must be vacated and the treble damages must stand. Id.

The dissent in Pinehurst gives light into the true counter argument that was advanced in the case. In the dissent written by Judge Phillips concurring in part and dissenting in part, Judge Phillips noted, "Limiting the Plaintiff's recovery and sanctions against the Defendants to three dollars makes a mockery of the Fair Trade Practices Act." Id. at 66, 338 S.E.2d at 918. Judge Phillips went on to state, "I would affirm the award of punitive damages by the trial judge." Id. Further, it must be noted that in North Carolina courts, a dissent in the Court of Appeals gives an automatic right of review which is discretionary to the NC Supreme Court. The Supreme Court looked at the opinion as well as Judge Phillips dissent and declined discretionary review. Pinehurst v. O'Leary Bros. Realty, Inc., 316 N.C. 378, 342 S.E.2d 896 (1986).

6

Therefore, based upon the above, this matter is at precisely the same procedural posture as the case in Pinehurst, to wit, an award has been made which awarded punitive damages and treble damages. Further, the Court of Appeals in Pinehurst determined that the only remedy available in light of these circumstances due to the compulsory nature of treble damages is to treble the damages and vacate the award for punitive damages. Any result in this matter other than removing the punitive damages from the Interim Award, would be a violation of North Carolina law based upon the procedural posture of this case. Simply put, it is too late for the Claimant to elect a different remedy and to withdraw the Chapter 75 claim. This panel has found a Chapter 75 violation and properly trebled the award as ordered in Pinehurst. Further, based upon the ruling in Pinehurst once this is done, no award of punitive damages can stand.

It is the request of the Respondent that the interim award be corrected pursuant to Rule 19 of the JAMS Streamlined Rules of Arbitration. The only way to correct this error under North Carolina law based upon the procedural posture is to vacate the award of punitive damages. Any failure to take this step or any alternative remedy would tantamount a manifest disregard of the law relating to treble damages and punitive damages under Chapter 75 of the North Carolina Statutes. The award in this matter is subject to appeal only in Federal Court pursuant to the terms of the Arbitration Agreement. Federal courts have held that an arbitration decision may be vacated when an arbitrator has exhibited a "manifest disregard of the law." Westerbeke Corp. v. Daihatsu Motor Co, Ltd., 304 F.3d 200 (2002). Further, the case law that stands for the proposition that punitive damages must be vacated when a Chapter 75 violation is found was cited by this panel in the Interim Award.

7

## Conclusion

Based upon the above, Respondent requests pursuant to Rule 19(i) of the JAMS Streamlined Rules that the Interim Award be corrected due to the "similar error" in the award and that the award of punitive damages be removed from the Interim Award and it be re-issued to reflect requirements of North Carolina law. Further, Respondent requests that any ruling or required reply to the request for Attorney's fees be postponed until this issue is fully resolved.

Respectfully submitted this the 15 of February, 2018.

**ENNIS BAYNARD MORTON
MEDLIN & BROWN, P.A.**

By: ___/s/ Ron D. Medlin, Jr.___

RON D. MEDLIN, JR.
NC State Bar No. 31682
P.O. Drawer 1327
Wrightsville Beach, NC 28480
Phone: (910) 256-3992

8



**JAMS ARBITRATION NO. 1440005377**


**JOSEPH TROY KESLAR**

      Claimant

v.


**FINANCE SOURCE, LLC, d/b/a KarMike USA**

      Respondent


## INTERIM AWARD

    This case arises out of Keslar's purchase of a used car from KarMike, and the financing of that purchase, in April, 2016. Keslar contends that KarMike increased the sales price of the car based on his bad credit rating and higher credit risk, and failed to disclose that price increase as a finance charge in violation of the Federal Truth in Lending Act ("TILA") which also constitutes a violation of North Carolina's Deceptive Trade Practices Act ("DTPA"). Keslar seeks statutory, compensatory and punitive damages, as well as attorney's fees.

    KarMike denies that the price of the car was increased due to the increased credit risk presented by Keslar, and contends that Keslar has not carried his burden of proof as to any of his claims. Apparently conceding that a sales price substantially lower than the price charged Keslar appeared on the Auto Trader website, KarMike argues that it did not know Auto Trader was posting that price and that it had never knowingly advertised that lower price.

FINDINGS OF FACT

The Sales Transaction

    Keslar utilized the internet to initiate his search for a used car, and looked for a car that fit within his budget. He saw the Suzuki automobile he ultimately

purchased from KarMike listed on Auto Trader for a price of $5995, and went to the dealership to shop. He was shown a couple of vehicles which he rejected before being shown the Suzuki, at KarMike's second location. He test-drove the Suzuki, liked it, but noticed an acceleration problem, which KarMike ultimately agreed to repair, and began discussing terms.

Keslar had told the KarMike salesperson at the outset that he had a bad credit rating, and he never mentioned the $5995 price he had seen on Auto Trader. No sales prices were shown of the cars on the lot. The first price proposed by KarMike was $8495, which Keslar rejected because of the size of the monthly payment. Keslar admitted that the size of the monthly payment was more important to him than the purchase price.

KarMike made a second proposal, for a sales price of $8143.51, which resulted in a monthly payment acceptable to Keslar, and the transaction was closed at that price. The TILA disclosure form reflecting the transaction shows an Annual Percentage Rate of 29%, Finance Charge of $3,994.91, and a Total Sale Price of $12,900.

Although denied by KarMike, both Keslar and another KarMike customer testified that they were told that the amount paid for the cars they were purchasing would have to be increased to cover higher financing fees, and KarMike documents are consistent with that having happened. KarMike's documents can also be viewed to reflect price increases on 29% of the vehicles sold during a 60 day period surrounding Keslar's purchase.

Multiple Prices

KarMike uses a third party, cloud based, software system for inventory management. The data reflected in that system is entered by KarMike employees, and can change from time to time. For example, a price can be increased due to repair work being performed to make the vehicle ready for sale.

Within the system, each vehicle can have two prices listed. While different names appear on those fields in different places, KarMike witnesses testified that the higher of the two prices was the "asking price" which should have been seen advertised, and that the lower price was the price below which approval of higher

management would be required. KarMike's owner equated the higher "asking price" with an "advertised price." KarMike witnesses also testified that it was not known that third party websites like Auto Trader and Car Finder were using the lower price from the inventory management system.

A witness from the third party software system provider offered a different understanding of the system operation than that offered by KarMike, and it is difficult to believe that KarMike employees had no better understanding of the system than they claimed at hearing. But KarMike's true understanding of its inventory management system, and which of the two prices should have been advertised, does not really affect the outcome of this case.

Print-outs from KarMike's software system reflect that KarMike acquired the Suzuki for less than $3000, and there was some evidence offered that the fair market retail value of the car was $4000. In April, 2016, on the date of the Keslar purchase, the "asking price" on the Suzuki reflected in the system was $6995, and the lower price was $5995, both of which were well below the first price proposed to Keslar, as well as the final agreed upon price. KarMike's claim in its post-hearing brief that "…there has never been an increase above the *asking* price of the vehicle," (Respondent's Brief, p.19, emphasis in the original) is clearly refuted by its own records. There is no real explanation for this difference, other than an increase to cover the additional costs of financing a high risk borrower, as Keslar says he was told.

KarMike's owner could not explain where the $8495 first proposal came from. The Sales Manager said he found it on the day of the sale on one of the screens in the software system. And indeed, that figure does appear in the "asking price" field in the system. However, the system also reflects that the change in "asking price" to $8495 took place in October, 2016, months after the transaction closed and about the time Keslar had begun to telephone KarMike as a result of his unhappiness with the purchase.

Keslar recorded one of his conversations with the Sales Manager. In that conversation, the Sales Manager clearly admits that the price of the Suzuki was increased because Keslar financed it through KarMike, and because of the potential costs of repossession cutting into the profit. He also responded

3

affirmatively when asked if Keslar could have purchased the vehicle for $6000 if he could have paid in cash. Efforts to explain these statements away at hearing were unconvincing, at best.

Although not involved in the Keslar transaction, the Sales Manager also admitted at hearing that KarMike would increase both sales price and trade-in value to hide the negative equity of a trade-in, thus misleading third parties purchasing the financing paper from KarMike. Keslar introduced evidence at hearing that this practice, as well as other practices of KarMike, are contrary to the standards of the industry.

KarMike's own records, coupled with its inability to explain the transaction in issue and its admission recorded by Keslar, demand the finding that KarMike increased the sales price of the Suzuki automobile in issue to account for the increased credit risk presented by Keslar.

### Events Subsequent to Sale

Keslar begain having mechanical issues with the Suzuki, including having to have it towed. He approached KarMike about trading the vehicle for another, and was told he could not because he owed more on the Suzuki than it was worth. By that point, Keslar had paid $3800 on the Suzuki debt, and had incurred the expense of keeping the vehicle insured. He quit making payments on the Suzuki, and KarMike repossessed it, but did not seek a deficiency.

## CONCLUSIONS OF LAW

KarMike's increase in the price of the Suzuki was causally related to Keslar's poor credit rating and increased credit risk, thus constituting an undisclosed finance charge in violation of TILA. *Cornist v. B.J.T. Auto Sales, Inc.,* 272 F.3d 322, 327 (6th Cir. 2001); *Diaz v. Paragon Mtrs.,* 424 F. Supp. 2d 519, 531 (EDNY 2006). Keslar is entitled to damages equal to twice the finance charge, with a $2000 cap. 15 U.S.C. §1640(a)(2)(A)(ii).

Keslar argues that the violation of TILA is also a *per se* violation of the North Carolina Deceptive Trade Practices Act, N.C. G.S§75-1.1 ("DTPA"), citing *In re Fifth Third Bank N.A.,* 217 N.C. App 199, 207 (2011), but that issue need not be reached. KarMike's conduct satisfies the requirement for a DTPA claim in that

4

it was unfair and deceptive, in commerce, and proximately caused actual injury to Keslar. Failing to disclose a hidden finance charge offends public policy and is thus unfair; it has the capacity to deceive or mislead and is thus deceptive. KarMike's conduct was also unethical and substantially injurious to consumers. *See, Walker v. Fleetwood Homes of N.C., Inc.,* 362 N.C. 63 (2007)

Keslar has sought recovery of his "actual" damages, consisting of his down payment, monthly payments made, insurance premiums, and taxes, totaling $5355.51. Neither party cited authority for the measure of damages for a DTPA claim, and KarMike did not address the "actual" damages claimed by Keslar at all in its briefing.

"The measure of damages used [in a DTPA claim] should further the purpose of awarding damages, which is to restore the victim to his original condition, to give back to him that which was lost...." *Bernard v. Central Carolina Truck Sales,* 68 N.C. App. 228, 233 (1984). "[T]he measure of damages is broader than common law actions" in contract and tort. *Sunbelt Rentals, Inc. v. Head & Engquist Equip. LLC,* 174 N.C. App. 49, 61 (2005) Accordingly, awarding Keslar the sums he had paid out in connection with the transaction in issue, $5355.51, would satisfy these measures.

Keslar also asks that this award be trebled, pursuant to N.C.G.S. §75-16. Inasmuch as the trebling is automatic and not a matter of discretion, *Pinehurst, Inc. v. O'Leary Bros. Realty,* 79 N.C. App 51, 61 (1986), Keslar is awarded the sum of $16,066.53.

Keslar seeks an imposition of punitive damages to punish and deter KarMike from its complained of conduct, pursuant to N.C.G.S. §1D. The evidence is clear and convincing that KarMike acted willfully and in disregard of Keslar's rights. While it is not reprehensible for a creditor to try to protect against a bad risk, it is reprehensible to do so in a manner that is misleading and deceptive, by failing to disclose a hidden finance charge. That KarMike reasonably anticipated and was aware that increasing the sales price could lead a debtor into additional financial difficulties is illustrated by the recorded statement of the Sales Manager to the effect that he had to worry about a default within three to six months.

5

Not only did KarMike conceal its additional finance charge by raising the sale price above what its owner identified as the proper "advertised" price, it was less than forthcoming during the discovery phase of this proceeding; additional insistence ultimately revealed the document showing the $8495 price was placed in the system months after the sale. KarMike's positions and explanations in this arbitration are so inconsistent with its own records that it bespeaks an effort to deceive within the framework of this proceeding. In the face of a blatant recorded admission by its Sales Manager, KarMike and its owner continued to deny the conduct, forced Keslar to arbitrate this matter to hearing, and continued even into its briefing to offer up excuses and justifications that cannot be supported by, and in some instances are contrary to, the evidence. Punitive damages are appropriate in this case.

KarMike has been so zealous in defending an indefensible position, and has now admittedly taken steps to further deprive its customers of the true "asking price" of its vehicles, that it is clear that a reasonably significant sum in punitive damages will be required to deter KarMike from future wrongful conduct. It is the hope of this tribunal that punitive damages in the amount of $50,000 will achieve that goal.

Lastly, Keslar has asked for an award of attoney's fees pursuant to N.C.G.S. §75-16.1. As previously noted, KarMike willfully engaged in the violation of the DTPA, and, in the face of the Sales Manager's recorded admission, there was an unwarranted refusal by KarMike to fully resolve this matter short of two hearings. Accordingly, Keslar is entitled to recover reasonable attorney fees. Additionally, as prevailing party on his TILA claim, Keslar is entitled to recover fees pursuant to 15 U.S.C. §1640(a)(3).

Counsel for Keslar shall have ten business days after publication of this award to submit a sworn application for fees. KarMike shall have ten business days following receipt of said application to make objection to it.

SUMMARY

1. Keslar is awarded the sum of $2000.00 on his TILA claim.
2. Keslar is awarded the sum of $16,066.51 on his DTPA claim
3. Keslar is awarded punitive damages in the sum of $50,000.00

6

4. Keslar is awarded attorney's fees in an amount to be determined.

Done this 8th day of February, 2018.

F. Carlton King Jr., Arbitrator

**Ron Medlin**

| | |
|---|---|
| **From:** | Ankur Haldar <ahaldar@jamsadr.com> |
| **Sent:** | Friday, February 16, 2018 9:33 AM |
| **To:** | Ron Medlin; matt@lemonlawnc.com; bjs@stricklinlawyer.com |
| **Subject:** | RE: Keslar, Joseph vs. Finance Source, LLC, dba KarMike USA - REF# 1440005277 |
| **Attachments:** | Invoices.pdf |

Per JAMS policy, the Arbitrator cannot consider Respondent's motion to correct the interim award until the outstanding balance owed is paid.

Thank you,
Ankur Haldar

**From:** Ron Medlin [mailto:rmedlin@ennis-baynard.com]
**Sent:** Thursday, February 15, 2018 2:22 PM
**To:** Ankur Haldar <ahaldar@jamsadr.com>; matt@lemonlawnc.com; bjs@stricklinlawyer.com; Carlton King <fking@fordharrison.com>
**Cc:** Ron Medlin <rmedlin@ennis-baynard.com>
**Subject:** Keslar, Joseph vs. Finance Source, LLC, dba KarMike USA - REF# 1440005277

Counsel,

Enclosed is Respondent's Request for Correction of Partial Final Award for consideration by the Arbitrator.

Thanks,

**Ron D. Medlin, Jr.**

Ennis · Baynard · Morton · Medlin · Brown
ATTORNEYS AT LAW

P.O. Drawer 1327
Wrightsville Beach, NC 28480
www.ebmmlawfirm.com
Phone: 910-256-3992
Cell:     919-922-5002
Fax:     910-256-3578
Email:   RMedlin@ennis-baynard.com



# INVOICE

**Invoice Date**
12/29/17

**Invoice Number**
0004241080-440

To:  **Bobby Stricklin**
     **Finance Source, LLC, d/b/a KarMike USA**
     **448 Westbrooke Shopping Center US 70 Hwy**
     **Havelock, NC 28532**

| | |
|---|---|
| Reference #: | **1440005277** AH |
| Billing Specialist: | **Erwin Gonzalez** |
| Email: | **egonzalez@jamsadr.com** |
| Telephone: | **(949) 224-4642** |
| Employer ID: | **68-0542699** |

RE:  **Keslar, Joseph vs. Finance Source, LLC, dba KarMike USA**

Representing:  **Finance Source, LLC, d/b/a KarMike USA**    Neutral(s):    **F. King, Jr. Esq.**

Hearing Type:  **Arbitration**    **Rep# 2**

| Date/ Time | Description | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|
| 12/22/17 | F. King, Jr. Esq.<br>Retainer Fees.<br>To be applied to reading, research, preparation of award, etc.<br>NOTE: At the conclusion of the case, any unused portion of this retainer will be refunded. | 5,152.00 | 1 | 5,152.00 |
| | Expenses/Retainers | | | 5,152.00 |
| | Total | | | $ 5,152.00 |

Invoice total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc. **Payment is due upon receipt.**

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**



JOSEPH TROY KESLAR,

     Claimant,

     vs.

FINANCE SOURCE, LLC, d/b/a KarMike
USA,

     Respondent,

**MEMORANDUM OF LAW
IN OPPOSITION TO
RESPONDENT'S
REQUEST FOR CORRECTION**

     Claimant, through counsel, submits the following Memorandum of Law in Opposition to Respondent's Request for Correction. In support thereof, Claimant respectfully shows the following:

## ARGUMENT

     Respondent's Request for Correction draws a previously unheard of distinction between a claimant in an arbitration proceeding and a plaintiff in a court proceeding. North Carolina law does not require that Mr. Keslar should have known (or guessed) what claims the arbitrator was going to decide in his favor before the award was released.

     Respondent's argument arises from a misreading of the <u>Pinehurst</u> case, it does not take into account the North Carolina Supreme Court decision in <u>Kuykendall</u>, and it conflates the dual role of the arbitrator in this proceeding.

### I.    RESPONDENT'S ANALYSIS OF <u>PINEHURST</u> IS INCORRECT.

<u>Pinehurst</u> does not mean what Respondent claims. <u>Pinehurst</u> involved a dispute between

1

two real estate development businesses over a "forty-acre tract of residential lots that plaintiff [Pinehurst] was then selling." Pinehurst, Inc. v. O'Leary Bros. Realty, Inc., 338 S.E.2d 918, 79 N.C. App. 51 (N.C. App., 1986). Plaintiff sued Defendant, alleging only four causes of action: "libel, tortious interference with contract, barratry, and unfair and deceptive trade practices…" Id. at 54. The lawsuit was filed in 1983, ten years before the enactment of N.C.G.S. § 1D-1, et seq., which codified the punitive damages remedy that, up until that point, had been available only through common law causes of action. See, e.g. N.C. Gen. Stat. § 1D-1. It is evident through a plain reading of Pinehurst that the case turned on an error by the trial judge, and had nothing at all to do with the Plaintiff's election of remedies.[1] The opinion states: "Following a trial without a jury, Judge Rousseau entered judgment for the plaintiffs on the unfair trade practices claim, ***but dismissed their other claims.***" Id. at 55. (emphasis added). Judge Rousseau then entered an order finding that the "Plaintiff sustained actual damages of $1.00" and awarded the plaintiffs "***the sum of $1.00 in actual damages and the sum of $18,000.00 in punitive damages***. Since the award of actual and punitive damages exceeds an award of treble the actual damages, the actual damages will not be trebled even though the court has found a violation of G.S. 75-1.1." Pinehurst, 79 N.C. App. at 56 (emphasis added). Thus, the Court of Appeals found that the trial court erred by substituting the nominal trebled amount with a common law punitive damages award. See id. at 63. The Court stated: "As [Chapter 75] is a hybrid statute, providing a remedy for an entirely statutory cause of action, analogies to other rules of common law governing the imposition of punitive damages should not control." Id. at 64. Responding to Pinehurst's "appealing argument that an additional punitive remedy is needed

---

[1] In fact, the word "elect" is used only one time in the entire opinion.

2

for intentional egregious conduct," the Court identified the critical missing piece to Pinehurst's case, (and the critical hole in Respondent's argument):

> "in cases involving intentional wrongdoing in which treble damages are minimal, *the plaintiff may pursue a common-law cause of action and seek punitive damages*. Since a plaintiff may pursue the common-law and the statutory causes of action in the same suit, if punitive damages are warranted and are awarded by the jury, *he may elect such a remedy in lieu of the statutory treble damages*."

Id. at 63 (emphasis added). This observation makes it abundantly clear that the Court did not reverse the punitive damages award because Pinehurst did not elect its remedy in time (or at all), as Respondent suggests; rather, the plaintiff *never had a remedy to elect* because it had never pled a cause of action that would allow for punitive damages to be imposed. The trial court erred by substituting the punitive damage award for the $3.00 trebled amount. Once the trial court fixed the verdict at $1.00 in actual damages and found that the defendant had violated G.S. § 75-1.1, it was bound by G.S. § 75-16 to treble the "actual damages assessed." Pinehurst, 79 N.C. App. at 62. Since there was no common law cause of action through which to assess punitive damages, and because N.C.G.S. § 1D-1, et seq had not been enacted at the time for the plaintiff to include in its complaint, the Court of Appeals had no choice but to reverse the trial court's ruling. Thus, far from being "specific instructions" on "how to properly address and correct an award of punitive damages and treble damages from the same conduct when no election of remedy is made by a Claimant," Pinehurst stands for the relatively mundane proposition that a trial court may not assess punitive damages in a Chapter 75 claim unless there is an accompanying common law or statutory claim on which the plaintiff also prevails.

3

II.     **A CLAIMANT MAY LATER MAKE AN ELECTION BETWEEN TREBLED DAMAGES UNDER CHAPTER 75 AND PUNITIVE DAMAGES, BUT MAY STILL RECOVER UNTREBLED COMPENSATORY DAMAGES AND COSTS/ FEES UNDER G.S. § 75-16.1.**

Pinehurst was decided in 1986. Since that time, the General Assembly has enacted the

Punitive Damages Statute and the North Carolina Supreme Court has clarified the interplay

between these damages and Chapter 75. In United Laboratories, Inc. v. Kuykendall, 437 S.E.2d

374, 335 N.C. 183 (N.C., 1993), the Supreme Court decided the question "whether and to what

extent a claimant who successfully prosecutes both a common law claim and an unfair practices

claim under Chapter 75 of our General Statutes is required to elect between remedies when both

claims arise out of essentially the same conduct." Id. at 374. After a jury trial in which the jury

awarded $100,000 in punitive damages and $15,000.00 in compensatory damages, the trial court

entered a "Judgment and Order" that provided that "Plaintiff…not being permitted to recover

both punitive damages and treble damages for unfair methods of competition and unfair trade

practices, shall, *within ten days of the filing of this Judgment*, file a Motion in this cause electing

between the recovery of punitive damages or the recovery of treble damages." Kuykendall, 335

N.C. at 188 (emphasis added).[2] The Plaintiff later elected to recover the $15,000.00 in

compensatory damages,[3] the $100,000.00 in punitive damages, and attorney's fees under G.S. §

---

2 Respondent's argument overlooked this procedural aspect to Kuykendall, which is a critical comparison to the procedural posture here. In Kuykendall, the jury returned a verdict, and the trial court allowed the Plaintiff ten days to elect the remedy. In the present case, the arbitrator (serving in place of the jury as the fact-finder), has entered an interim award (verdict), and will enter a Final Award later with remedies which Claimant can elect before the award is confirmed.

3 Defendant argued unsuccessfully that "United must elect between the award of $15,000 in untrebled compensatory damages in the unfair practices claim and the award of $100,000 in punitive damages in the tortious interference claim. The Court addressed this argument as follows: "Any right, whether statutory or constitutional, ordinarily may be waived by the party entitled to it. We see no reason why a plaintiff in an unfair practices claim may not waive

4

75-16.1, which were ultimately determined to be $250,000.00.

The Court went through an extensive analysis of the purpose behind both punitive damages and treble damages under § 75-16. It found that, while the prevailing plaintiff must elect between punitive and treble damages, he or she can also choose to recover the compensatory, untrebled damages under Chapter 75, as well as costs/fees under 75-16.1.

> "We hold, therefore, that since the conduct required for an award of attorneys' fees is different from the conduct required for an award of punitive damages and since the two recoveries serve different interests, permitting the plaintiff to recover both will not result in "double redress for a single wrong…;" and United is not required to elect between the two. United may, therefore, recover punitive damages in its tort claim and attorneys' fees in its unfair practice claim."

> Kuykendall, 335 N.C. 195 (internal citations omitted).

Thus, Kuykendall makes clear that Claimant can elect the greater of the punitive damages award or the trebled compensatory award. In addition, rather than being a single moment in time, past which the right to elect the punitive damage award is forever lost, trial courts and arbitrators can allow a period time for a plaintiff or claimant to elect the appropriate remedy, as the Plaintiff in Kuykendall did when it was given ten full days in which to decide.

Since the punitive damages award in this case is in excess of the trebled damages amount, Claimant therefore elects the punitive damages remedy of $50,000.00, the compensatory damages award of $5,355.51, and costs in an amount to be determined by the arbitrator based on the Fee Affidavit and documents previously submitted.

---

the right to recover treble damages and elect instead, for reasons satisfactory to the plaintiff, to recover the untrebled compensatory damages." Kuykendall, 335 N.C. 194, fn. 6.

5

### III. CLAIMANT'S REMEDY IS ELECTED AT THE AWARD CONFIRMATION STAGE, BEFORE THE AWARD IS CONVERTED TO FINAL JUDGMENT.

Respondent argues that Claimant should have guessed, *before the award was entered*, not only which remedy, among several, he would ultimately be awarded, but which remedy would be the most advantageous under the circumstances. As stated above, this is simply not the law in North Carolina, or any other state, and never has been.

Respondent forgets that, much like a bench trial, the arbitrator in an arbitration proceeding is both the fact-finder (jury) and the judge, deciding how the law applies to those factual findings. It simply defies logic to suggest that an election must be made before the post-award factual issues regarding trebling, fees, etc. have been applied to the law, much less before the fact finder has even rendered a decision. Indeed, page four, first full paragraph of Respondent's own Memorandum both illustrates this point and undermines Respondent's argument:

> "Further, the court noted that a Plaintiff [Claimant] should be allowed to elect its remedy after the jury verdict [arbitration award]. <u>Id.</u> at 426, 344 S.E.2d at 301. The court went on to state, "We hold that it would be manifestly unfair to require Plaintiffs [Claimants] in such cases to elect before a jury [arbitrator] has answered the issues and the trial court [arbitrator] has determined whether to treble the compensatory damages…and that such election would be allowed in the judgment [final award/confirmed judgment]." <u>Id.</u>

Resp't Memo at p. 4 (substitutions added for emphasis).

Thus, because the final award has not yet been entered nor confirmed with the Court, Claimant's time to elect his remedy has not yet passed. Nevertheless, Claimant respectfully elects the remedy outlined herein.

6

## CONCLUSION

For the foregoing reasons, Claimant respectfully requests that the Arbitrator deny Respondent's request for Correction of the Award. As the award was an interim award under JAMS Rule 19(c), Claimant requests that the Final Award reflect the elected punitive damages remedy of $50,000.00, compensatory damages award of $5,355.51, statutory damages of $2,000.00, and fees and costs in the amount reflected in the previously submitted Fee Affidavit. Claimant further requests that the Arbitrator accept the supplemental timesheet attached hereto for the time incurred on this Memorandum and incorporate it into the Fee Affidavit by reference.

This the 16th day of February, 2018.

NORRIS LAW FIRM, PLLC

By:     */s/ Matt Norris*
        J. Matthew Norris
        NC Bar No. 37206
        P.O. Box 1318
        Wake Forest, NC 27588
        Telephone: (919) 981-4475
        Facsimile: (919) 926-1676
        Email: matt@lemonlawnc.com
        *Counsel for Claimant*

7

JOSEPH TROY KESLAR,

     Claimant,

    vs.

FINANCE SOURCE, LLC, d/b/a KarMike
USA,

     Respondent,

**SUPPLEMENTAL
ATTORNEY FEE AFFIDAVIT
OF
MATT NORRIS**

I, J. Matthew Norris, attorney for the Claimant, hereby state as follows:

1.     The time record attached hereto as Exhibit H reflects the time incurred in researching and writing the memorandum of law in opposition to Respondent's Request for Correction of the Interim Award.

2.     The total lodestar calculation of attorney's fees for the 6.4 hours spent on this task was $1,920.00

3.     I do hereby solemnly affirm under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

This the 16 day of February, 2018.

_____
J. Matthew Norris
*Counsel for Claimant*

8

# Client Activity Report (02/16/2018)



EXHIBIT
H

Dates: 02/15/2018 – 02/16/2018

### Joseph Keslar

00012-Keslar: Keslar v. Finance Source, LLC, d/b/a KarMike USA (Matt Norris)

| Date | Status | User | Description | Note | Quantity | Price | Total |
|------|--------|------|-------------|------|----------|-------|-------|
| 02/16/2018 | Unbilled | Matt Norris | Drafted Documents | Reviewed and corrected Memo; applied corrections | 0.40 | $300.00 | $120.00 |
| 02/16/2018 | Unbilled | Matt Norris | Drafted Documents | Final Review and Edit of the Memo; preparation of the Supplemental Fee Affidavit and time records; emailed to parties and arbitrator | 1.20 | $300.00 | $360.00 |
| 02/15/2018 | Unbilled | Matt Norris | Research | Research Cases cited by Respondent; research newer cases and statutes (1D-1, et seq) | 1.60 | $300.00 | $480.00 |
| 02/15/2018 | Unbilled | Matt Norris | Drafted Documents | Drafted Memo IOT Request to Correct Award | 3.20 | $300.00 | $960.00 |

|  | | |
|---|---|---|
| **Unbilled Total:** | **6.40 hours, $1,920.00** |
| **Matter Total:** | **6.40 hours, $1,920.00** |
| **Client Total:** | **6.40 hours, $1,920.00** |
| **Total:** | **6.40 hours, $1,920.00** |



JAMS REF. 1440005277

JOSEPH TROY KESLAR,                )
                                   )
          Claimant,                )
                                   )
vs.                                )
                                   )
FINANCE SOURCE, LLC,               )
d/b/a KARMIKE USA,                 )
                                   )
          Respondent.              )

## RESPONDENT'S OBJECTION TO CLAIMANT'S
## APPLICATION FOR ATTORNEY'S FEES

Submitted February 27, 2018

Ron D. Medlin, Jr.
Ennis, Baynard, Morton, Medlin & Brown

     Respondent, through counsel, submits the following Objection in opposition to Claimant's Application for Attorney's Fees and in support thereof respectfully shows the following:

### I. Attorney's fees are not justified in this case because of the result obtain by the Claimant.

     Due to the result ultimately obtained by the Claimant that is consistent with North Carolina law, compared to the amount offered to resolve this case, attorney's fees are not justified.  The panel's order in this case states that the Respondent failed to resolve this matter.  However, no inquiry was made from the panel as to any settlement negotiations made in this case at any point prior to the hearing.  Without this information, such a ruling would be incorrect as it is made without all the relevant facts, including the amount offered to resolve this case and the result finally obtained.

In a Truth in Lending Act claim, one of the factors examined by the court is the amount in controversy and the results obtained. *Robinson v. Equifax Info. SVE., LLC.* 560 F.3d 235 (4th Cir. 2009). Similarly, in unfair and deceptive trade practices claims, an award of attorney's fees is not automatic but can only be found if the non-prevailing party refused to resolve the matter. *Shepherd v. Bonita Vista Properties, LP* 191 N.C. App. 614, 664 S.E. 2d 338 (2008) *citing, Barbe v. ATL Marine Sales and Serv. Inc.,* 115 N.C. App. 641, 446 S.E. 2d 117 (1994). In order to support an attorney's fees award, there must be findings of fact to support the award. *Id.* The interim award that purports to award attorney's fees does not have specific findings of fact and does not address any offers made to the Claimant compared to the result finally obtained.

The Respondent in this matter offered the Claimant $10,000.00 on two separate occasions to resolve this case in advance of the hearing. It was first offered on August 21, 2017. In addition, this offer was reiterated on September 5, 2017 and rejected by the Plaintiff *see Exhibit A.* Therefore, the Claimant was offered two opportunities to settle this matter for $10,000.00 long before incurring the arbitration hearing and associated attorney's fees. This offer was rejected.

When this offer is compared to the compensatory damages obtained by the Claimant, the amount is below the offer. As stated in a prior Motion, the award of punitive damages is in error and must be stricken due to the fact that both punitive damages and treble damages cannot be obtained. The Interim Award in this case provided the Plaintiff in $2,000.00 in damages for his Truth in Lending Act claim as well as compensatory damages in the amount of $5,355.51. For a total amount of compensatory damages of $7,355.51. When compared to the offer made twice before the hearing, the result finally obtained is lower than the award and therefore attorney's fees should be disallowed. In addition to the requirements for attorney's fees in the Truth in

Lending Act and Chapter of 75 of the North Carolina General Statues, there is support in other areas of North Carolina law that in order to obtain attorney's fees, the damages must exceed the pre-trial offer and there must be unjustified refusal to settle. *See,* N.C.Gen.Stat § 6-21.1. Neither applies in this case. It is only when the damages are trebled that the amount is above the offer. As stated previously, the punitive damages are contrary to North Carolina law. Therefore, when reviewing this framework it cannot be determined that the Respondent refused to resolve the matter. Simply put, the Respondent offered more than the compensatory damages incurred by Mr. Keslar and therefore one of the essential *Robinson* factors is missing which is a refusal to resolve the matter. For these reasons, the attorney's fees should not be allowed.

## II. The rate claimed by Claimant's counsel is excessive.

As provided in the previous affidavits, the hourly rate by the undersigned is less than half of the rate claimed by Mr. Norris. In addition, the undersigned has more years of experience than Mr. Norris. Finally, the hourly rate is less than the $250 rate charged by Mr. Stricklin who has over 30 years of experience practicing law. The $300.00 hourly rate is not justified and is excessive. Therefore, if any attorney's fees are considered, the hourly rate should be reduced to a reasonable amount.

The Fourth Circuit addressed the issue of hourly rates in the case of *Grissom v. The Mills Corporation,* 549 F.3d 313 (2008). In *Grissom,* the court determined only a reasonable attorney's fee should be included. For attorneys between 8 and 10 years experience in the District of Columbia Bar, the rate was $270.00. *Id.* Certainly, the rate in North Carolina should be lower than the District of Columbia. The court noted that the prevailing hourly rate evidence presented by the Claimant was inadequate to support the award and that examples of similar awards in like cases are insufficient to carry the burden of proof. *Id.* Similarly, Mr. Norris'

example of cases is insufficient to carry the burden of proof. Although Mr. Norris claims a previously awarded hourly rate, it appears that he has never been awarded a similar amount of attorneys as claimed in this case. For example, in his three cases he cites he has been awarded amounts between $2,270.00 and $8,105.33. (See Claimant's Affidavit for attorney's fees in attachment). In addition, the cases he has cited involve a Default Judgment, Fees for a party's Failure to Comply with a Court Order in a Motion for Summary Judgment. He has offered no hourly rate evidence that he has been award these facts in a matter that has ever been taken to the point of an arbitration award or a jury verdict. Simply put, it is one thing to ask for attorney's fees of $300.00 an hour when your fees add up to under $10,000.00. It is another thing when the Claimant is seeking over $50,000.00 in attorney's fees. For the reasons stated above, the hourly rate quoted by Mr. Norris is excessive, not in line with the case law nor the attorney's fees by Respondent's counsel for the very same case and therefore only a reasonable amount of attorney's fees should be award should this panel decide to award any attorney's fees contrary to the result obtained.

### III. The amount of hours claimed by Claimant's counsel is excessive.

The Federal Courts have ruled that hours that are not reasonably expended in advancing a claim should not be awarded. *Strange v. Monogram Credit Bank*, 129 F.3d 93 (7th Cir. 1997). In *Strange*, the court stated that "Cases may overstaffed, the skill experience of lawyers varies widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant and otherwise unnecessary." *Id.* 946. Similarly, the hours requested by Claimant's counsel are excessive in light of the procedural nature of this case and how this matter was litigated by the Claimant. At the outset of this matter, it was scheduled for hearing on September 7, 2017. At the time of the hearing, Claimant had obtained every item

of discovery that he had requested. Claimant had requested items by name and they had been provided by the Respondent. Claimant had also assured the Respondent and the Arbitrator that he had all the discovery he needed. This panel stated that the matter would be arbitrated to its conclusion on that date. On September 7, 2017, Claimant's counsel came to the hearing unprepared, without the available witnesses and was unable to carry the burden of proof on that date. Specifically, the arbitrator admonished Claimant's counsel for its lack of preparation and stated how he had not carried the burden of proof on that date. Graciously, the arbitrator granted Mr. Keslar's counsel additional time to prepare his case, conduct discovery and have additional witnesses and hearings. Thereafter, many months of additional discovery and additional hearing transpired. Up to and including the hearing, Claimant's counsel had only expended 103 hours on this case.

Claimant attempts to overcome asking for excessive attorney's and time beyond the hearing by claiming that Respondent mounted a "Stalingrad Defense." However, a reading of the case cited by claimant for this proposition has no application to the case at bar. *In In re General Motors Corp.* (110 F.3d 1003 (4th Cir. 1997)) the case cited by claimant, the court found the party against whom attorney's fees were awarded employed an "army of attorneys", made personal attacks against opposing counsel, violated court orders and destroyed documents. *Id.* No such conduct has occurred in this case. What Claimant seeks is to punish Respondent for fully defending the case after reasonable offers to resolve this matter were rejected. To punish Respondent for defending a claim after a reasonable offer has been rejected is contrary to the adversarial nature of American jurisprudence.

It is wholly unfair and unreasonable for the Respondent to be asked to pay the Claimant's counsel attorney's fees that were incurred due to counsel's lack of preparation for the

hearing of this matter. Time spent after the hearing was excessive, redundant and otherwise unnecessary. Counsel should have been prepared at the time of the hearing to carry the burden of proof. To ask Respondent to pay for Claimant's counsel's lack of preparation and inability to carry the burden of proof on the date of the hearing, despite being provided all of the discovery he had requested at that time, would be wholly unfair and contrary to the standards as outlined in *Strange* which would be to have a party pay for **excessive, redundant and unnecessary** attorney's fees.

### IV. Conclusion

Based upon all of the above, Respondent respectfully requests that the panel consider the offer made versus the result obtained and deny the Claimant's Application for Attorney's Fees. Alternatively, should this Panel endeavor to award attorney's fees, Respondent respectfully requests that the hourly rate be reduced to a reasonable hourly rate and that the hours be limited to the hours expended up to and through the arbitration hearing of September 7, 2017.

Respectfully submitted this the 1st day of March, 2018.

**ENNIS BAYNARD MORTON
MEDLIN & BROWN, P.A.**

By:  /s/Ron D. Medlin, Jr.
RON D. MEDLIN, JR.
NC State Bar No. 31682
P.O. Drawer 1327
Wrightsville Beach, NC 28480
Phone: (910) 256-3992



EXHIBIT
I

**JAMS ARBITRATION NO. 1440005377**

**JOSEPH TROY KESLAR**

      **Claimant**

**v.**

**FINANCE SOURCE, LLC, d/b/a KarMike USA**

      **Respondent**

## ORDER ON RESPONDENT'S RULE 19 MOTION

Respondent has filed a motion seeking a "correction" of a "partial final" award in this matter pursuant to Rule 19(i) of the Streamlined Rules. First, the award entered was an Interim award, and not a Partial Final award. Even if it had been, Rule 19 does not contemplate a substantive change in the award such as Respondent has sought, the striking of the punitive damages award. However, since the award was Interim and not Final, nor partially so, the doctrine of *functus officio* is not in play here, and Respondent's request could be granted, if it had merit. It does not.

Respondent's argument that Claimant had to elect between punitive damages and treble damages before he even knew if he had a choice makes no sense. Furthermore, it is contrary to the law of North Carolina. A plaintiff or claimant must be provided an opportunity to elect between remedies after the rendition of a jury verdict apprising him of his damages. *See, United Laboratories, Inc. v. Kuykendall,* 335 N.C. 183 (1993); *Mapp v. Toyota World,* 81 N.C. App. 421 (1986) (to require a choice sooner would be "unfair"). The Interim Award in this case is analogous to such a verdict. And while it is likely that Claimant could have waited until he sought confirmation of the award to make an election, he has announced his election in response to the Rule 19 motion. So even if we analogize

a Final Award to a Final Judgment, having made an election prior to entry of a Final Award, Claimant has complied with the law of North Carolina.

Respondent's Motion is DENIED.

This 26th day of March, 2018.

F. Carlton King Jr., Arbitrator

**JOSEPH TROY KESLAR**

      **Claimant**

**v.**


**FINANCE SOURCE, LLC, d/b/a KarMike USA**

      **Respondent**

## FINAL AWARD

This case arises out of Keslar's purchase of a used car from KarMike, and the financing of that purchase, in April, 2016. Keslar contends that KarMike increased the sales price of the car based on his bad credit rating and higher credit risk, and failed to disclose that price increase as a finance charge in violation of the Federal Truth in Lending Act ("TILA") which also constitutes a violation of North Carolina's Deceptive Trade Practices Act ("DTPA"). Keslar seeks statutory, compensatory and punitive damages, as well as attorney's fees.

KarMike denies that the price of the car was increased due to the increased credit risk presented by Keslar, and contends that Keslar has not carried his burden of proof as to any of his claims. Apparently conceding that a sales price substantially lower than the price charged Keslar appeared on the Auto Trader website, KarMike argues that it did not know Auto Trader was posting that price and that it had never knowingly advertised that lower price.

FINDINGS OF FACT

The Sales Transaction

Keslar utilized the internet to initiate his search for a used car, and looked for a car that fit within his budget. He saw the Suzuki automobile he ultimately

1

purchased from KarMike listed on Auto Trader for a price of $5995, and went to the dealership to shop. He was shown a couple of vehicles which he rejected before being shown the Suzuki, at KarMike's second location. He test-drove the Suzuki, liked it, but noticed an acceleration problem, which KarMike ultimately agreed to repair, and began discussing terms.

Keslar had told the KarMike salesperson at the outset that he had a bad credit rating, and he never mentioned the $5995 price he had seen on Auto Trader. No sales prices were shown of the cars on the lot. The first price proposed by KarMike was $8495, which Keslar rejected because of the size of the monthly payment. Keslar admitted that the size of the monthly payment was more important to him than the purchase price.

KarMike made a second proposal, for a sales price of $8143.51, which resulted in a monthly payment acceptable to Keslar, and the transaction was closed at that price. The TILA disclosure form reflecting the transaction shows an Annual Percentage Rate of 29%, Finance Charge of $3,994.91, and a Total Sale Price of $12,900.

Although denied by KarMike, both Keslar and another KarMike customer testified that they were told that the amount paid for the cars they were purchasing would have to be increased to cover higher financing fees, and KarMike documents are consistent with that having happened. KarMike's documents can also be viewed to reflect price increases on 29% of the vehichles sold during a 60 day period surrounding Keslar's purchase.

Multiple Prices

KarMike uses a third party, cloud based, software system for inventory management. The data reflected in that system is entered by KarMike employees, and can change from time to time. For example, a price can be increased due to repair work being performed to make the vehicle ready for sale.

Within the system, each vehicle can have two prices listed. While different names appear on those fields in different places, KarMike witnesses testified that the higher of the two prices was the "asking price" which should have been seen advertised, and that the lower price was the price below which approval of higher

2

management would be required. KarMike's owner equated the higher "asking price" with an "advertised price." KarMike witnesses also testified that it was not known that third party websites like Auto Trader and Car Finder were using the lower price from the inventory management system.

A witness from the third party software system provider offered a different understanding of the system operation than that offered by KarMike, and it is difficult to believe that KarMike employees had no better understanding of the system than they claimed at hearing. But KarMike's true understanding of its inventory management system, and which of the two prices should have been advertised, does not really affect the outcome of this case.

Print-outs from KarMike's software system reflect that KarMike acquired the Suzuki for less than $3000, and there was some evidence offered that the fair market retail value of the car was $4000. In April, 2016, on the date of the Keslar purchase, the "asking price" on the Suzuki reflected in the system was $6995, and the lower price was $5995, both of which were well below the first price proposed to Keslar, as well as the final agreed upon price. KarMike's claim in its post-hearing brief that "…there has never been an increase above the *asking* price of the vehicle," (Respondent's Brief, p.19, emphasis in the original) is clearly refuted by its own records. There is no real explanation for this difference, other than an increase to cover the additional costs of financing a high risk borrower, as Keslar says he was told.

KarMike's owner could not explain where the $8495 first proposal came from. The Sales Manager said he found it on the day of the sale on one of the screens in the software system. And indeed, that figure does appear in the "asking price" field in the system. However, the system also reflects that the change in "asking price" to $8495 took place in October, 2016, months after the transaction closed and about the time Keslar had begun to telephone KarMike as a result of his unhappiness with the purchase. Since the $8495 price was not in the system until October, the Manager could not possibly have seen it on the day of the sale as he testified.

Keslar recorded one of his conversations with the Sales Manager. In that conversation, the Sales Manager clearly admits that the price of the Suzuki was

increased because Keslar financed it through KarMike, and because of the potential costs of repossession cutting into the profit. He also responded affirmatively when asked if Keslar could have purchased the vehicle for $6000 if he could have paid in cash. Efforts to explain these statements away at hearing were unconvincing, at best.

Although not an issue in the Keslar transaction, the Sales Manager also admitted at hearing that KarMike would increase both sales price and trade-in value to hide the negative equity of a trade-in, thus misleading third parties purchasing the financing paper from KarMike. Keslar introduced evidence at hearing that this practice, as well as other practices of KarMike, are contrary to the standards of the industry.

KarMike's own records, coupled with its inability to explain the transaction in issue and its admission recorded by Keslar, demand the finding that KarMike increased the sales price of the Suzuki automobile in issue to account for the increased credit risk presented by Keslar.

### Events Subsequent to Sale

Keslar begain having mechanical issues with the Suzuki, including having to have it towed. He approached KarMike about trading the vehicle for another, and was told he could not because he owed more on the Suzuki than it was worth. By that point, Keslar had paid $3800 on the Suzuki debt, and had incurred the expense of keeping the vehicle insured. He quit making payments on the Suzuki, and KarMike repossessed it, but did not seek a deficiency.

## CONCLUSIONS OF LAW

KarMike's increase in the price of the Suzuki was causally related to Keslar's poor credit rating and increased credit risk, thus constituting an undisclosed finance charge in violation of TILA. *Cornist v. B.J.T. Auto Sales, Inc.,* 272 F.3d 322, 327 (6th Cir. 2001); *Diaz v. Paragon Mtrs.,* 424 F. Supp. 2d 519, 531 (EDNY 2006). Keslar is entitled to damages equal to twice the finance charge, with a $2000 cap. 15 U.S.C. §1640(a)(2)(A)(ii).

Keslar argues that the violation of TILA is also a *per se* violation of the North Carolina Deceptive Trade Practices Act, N.C. G.S§75-1.1 ("DTPA"), citing

4

*In re Fifth Third Bank N.A.,* 217 N.C. App 199, 207 (2011), but that issue need not be reached. KarMike's conduct satisfies the requirement for a DTPA claim in that it was unfair and deceptive, in commerce, and proximately caused actual injury to Keslar. Failing to disclose a hidden finance charge offends public policy and is thus unfair; it has the capacity to deceive or mislead and is thus deceptive. KarMike's conduct was also unethical and substantially injurious to consumers. *See, Walker v. Fleetwood Homes of N.C., Inc.,* 362 N.C. 63 (2007)

Keslar has sought recovery of his "actual" damages, consisting of his down payment, monthly payments made, insurance premiums, and taxes, totaling $5355.51. Neither party cited authority for the measure of damages for a DTPA claim, and KarMike did not address the "actual" damages claimed by Keslar at all in its briefing.

"The measure of damages used [in a DTPA claim] should further the purpose of awarding damages, which is to restore the victim to his original condition, to give back to him that which was lost...." *Bernard v. Central Carolina Truck Sales,* 68 N.C. App. 228, 233 (1984). "[T]he measure of damages is broader than common law actions" in contract and tort. *Sunbelt Rentals, Inc. v. Head & Engquist Equip. LLC,* 174 N.C. App. 49, 61 (2005) Awarding Keslar the sums he had paid out in connection with the transaction in issue, $5355.51, would satisfy these measures.

Keslar also asks that this award be trebled, pursuant to N.C.G.S. §75-16. Inasmuch as the trebling is automatic and not a matter of discretion, *Pinehurst, Inc. v. O'Leary Bros. Realty,* 79 N.C. App 51, 61 (1986), Keslar is awarded the sum of $16,066.53.

Keslar seeks an imposition of punitive damages to punish and deter KarMike from its complained of conduct, pursuant to N.C.G.S. §1D. The evidence is clear and convincing that KarMike acted willfully and in disregard of Keslar's rights. While it is not reprehensible for a creditor to try to protect against a bad risk, it is reprehensible to do so in a manner that is misleading and deceptive, by failing to disclose a hidden finance charge. That KarMike reasonably anticipated and was aware that increasing the sales price could cause harm by leading a debtor into additional financial difficulties is illustrated by the recorded statement of the

5

Sales Manager to the effect that he had to worry about a default within three to six months.

Not only did KarMike conceal its additional finance charge by raising the sale price above what its owner identified as the proper "advertised" price, it was less than forthcoming during the discovery phase of this proceeding; additional insistence ultimately revealed the document showing the $8495 price was placed in the system months after the sale. KarMike's positions and explanations in this arbitration are so inconsistent with its own records that it bespeaks an effort to deceive within the framework of this proceeding. In the face of a blatant recorded admission by its Sales Manager, KarMike and its owner continued to deny the conduct, forced Keslar to arbitrate this matter to hearing, and continued even into its briefing to offer up excuses and justifications that cannot be supported by, and in some instances are contrary to, the evidence. Punitive damages are appropriate in this case.

KarMike has been so zealous in defending an indefensible position, and has now admittedly taken steps to further deprive its customers of the true "asking price" of its vehicles, that it is clear that a reasonably significant sum in punitive damages will be required to deter KarMike from future wrongful conduct. It is the hope of this tribunal that punitive damages in the amount of $50,000 will achieve that goal.

Lastly, Keslar has asked for an award of attorney's fees pursuant to N.C.G.S. §75-16.1. As previously noted, KarMike willfully engaged in the violation of the DTPA, and, in the face of the Sales Manager's recorded admission, there was an unwarranted refusal by KarMike to fully resolve this matter short of two hearings. Accordingly, Keslar is entitled to recover reasonable attorney fees. Additionally, as prevailing party on his TILA claim, Keslar is entitled to recover fees pursuant to 15 U.S.C. §1640(a)(3).

## POST-INTERIM AWARD PROCEEDINGS

The recovery awarded Claimant set forth above was originally set out in an Interim Award, which also allowed an application for attorney fees by Claimant. Thereafter, Respondent filed a motion seeking a "correction" of the award to strike the award of punitive damages, arguing that Claimant had failed to elect between

6

the awarded trebled damages and the awarded punitive damages. However North Carolina law does not require an election before the Claimant even knew what damages he would have to elect between or if an election would even be necessary. In response to the motion, Claimant made an election, selecting the punitive damage award, thus satisfying North Carolina law. Respondent's motion was denied in a separate order addressing the issue in more detail.

Claimant duly made application for attorney fees, accompanied by affidavits of counsel, and two North Carolina lawyers who specialize in consumer litigation as does Claimant's counsel. Claimant's counsel also produced his time records. Both lawyers supporting the application swore that the rate and time spent on the case were reasonable. The fees sought amount to $49,917.50, together with expenses in the amount of $2979.16.

Respondent objected to the fee application on three grounds: that there was no refusal to resolve the case; that the rate claimed was excessive; and that the time claimed was excessive, particularly as it related to time following the first hearing. Respondent proffered, and Claimant has not disputed, that a $10,000 settlement offer was made on August 21 and again on Sept. 5 as a "take it or leave it" proposition, prior to the Sept. 7, 2017 hearing. Respondent has compared that offer with the un-trebled actual damages awarded Claimant together with the TILA award, to argue that the offer exceeds the actual recovery and thus eliminates the requisite element of refusal to resolve under North Carolina law.

However, Respondent's argument ignores a great deal. First of all, the evidence necessary to establish the TILA violation was essentially the same as to establish the DTPA claim, and Claimant is entitled to recover attorney fees as a part of his TILA recovery. Additionally, by the time the offer was made, Claimant had already spent a great deal of time, *See, Clark Materials Handling v. Toyota Materials Handling USA, Inc.,* 2015 U. S. Dist. LEXIS 72510 (W.D. N.C. 2015). and there is nothing to suggest what, if any, portion of the offer was intended to cover the TILA attorney fees claim.

Further when the offer is compared to the actual recovery, including the punitive damages award Claimant has elected, *See, Irwin Indus. Tool co. v. Worthington Cylinders Wisconsin, LLC,* 747 F. Supp. 2d 590 (W.D. N.C. 2010),

7

together with the consumer protection aspect of the statutes involved, it must be said that Claimant's counsel was very successful, both for his client and the consuming public. *See, Hensley v. Eckerhart*, 461 U.S. 124 (1983)   Respondent's "take it or leave it" offer in the face of the claims made, and in the face of the admissions in its agent's recorded conversation, constitute a refusal to fully resolve the matter.

As to rate, Claimant has proffered previous awards at his $300 rate, and two North Carolina lawyers practicing in his specialty have opined as to the reasonableness of that rate. The rates of Respondent's counsel, who have not claimed expertise in consumer litigation, are irrelevant.

As to time spent, the submissions of Respondent's counsel demonstrate the expenditure of 177 hours, *more* than the 171 claimed by Claimant's counsel. Respondent's argument that time beyond the Sept. 7 hearing is attributable to Claimant's lack of preparation for the hearing has no merit. Had the post hearing telephone testimony and other evidence been necessary because of some culpable failing on the part of counsel, it would not have been allowed. Respondent's objections to Claimant's application for fees are rejected.


SUMMARY

1. Keslar is awarded the sum of $2000.00 on his TILA claim.
2. Keslar is awarded punitive damages in the sum of $50,000.00, based on his previous election.
3. Keslar is awarded attorney's fees in the amount of $49,917.50, and expenses in the amount of $2979.16.

Done this 26th day of March, 2018.


F. Carlton King Jr.

F. Carlton King Jr., Arbitrator

8



EXHIBIT J

JAMS®

# STATEMENT OF ACCOUNT

TO: **Bobby Stricklin**
**Finance Source, LLC, d/b/a KarMike USA**
**448 Westbrooke Shopping Center US 70 Hwy**
**Havelock, NC 28532**

| | | |
|---|---|---|
| Reference #: | **1440005277** | AH |
| Billing Specialist: | **Erwin Gonzalez** | |
| Email: | **egonzalez@jamsadr.com** | |
| Telephone: | **949-224-4642** | |
| Employer ID: | **68-0542699** | |

RE: **Keslar, Joseph vs. Finance Source, LLC, dba KarMike USA**

Representing: **Finance Source, LLC, d/b/a KarMike USA**   Neutrals(s): **F. King, Jr. Esq.**

Hearing Type: **Arbitration**   REP# 2

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 02/24/17 | INVOICE #0003967224-440 | 1,000.00 | | 1,000.00 |
| 03/16/17 | CK #4612 | | 1,000.00 | 0.00 |
| | Paid By: Stricklin Law Firm PA | | | |
| 04/06/17 | INVOICE #0004007004-440 * | 6,440.00 | | 6,440.00 |
| 05/26/17 | CK #4692 | | 6,440.00 | 0.00 |
| | Paid By: Stricklin Law Firm PA | | | |
| 06/09/17 | CREDIT MEMO # #0004060539 * | | 6,440.00 | (6,440.00) |
| 06/09/17 | INVOICE #0004060540-440 | 980.62 | | (5,459.38) |
| 06/12/17 | INVOICE #0004060848-440 * | 11,592.00 | | 6,132.62 |
| 06/30/17 | INVOICE #0004080712-440 | 219.03 | | 6,351.65 |
| 08/31/17 | INVOICE #0004125662-440 | 735.64 | | 7,087.29 |

Outstanding Balance:   7,087.29

YOUR ACCOUNT BALANCE IS DUE UPON RECEIPT
Please make checks payable to JAMS, Inc.

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**



# INVOICE

**Invoice Date**
09/15/17

**Invoice Number**
0004136474-440

To: **Bobby Stricklin**
**Finance Source, LLC, d/b/a KarMike USA**
**448 Westbrooke Shopping Center US 70 Hwy**
**Havelock, NC 28532**

| | |
|---|---|
| Reference #: | **1440005277** AH |
| Billing Specialist: | **Erwin Gonzalez** |
| Email: | **egonzalez@jamsadr.com** |
| Telephone: | **(949) 224-4642** |
| Employer ID: | **68-0542699** |

RE: **Keslar, Joseph vs. Finance Source, LLC, dba KarMike USA**

Representing: **Finance Source, LLC, d/b/a KarMike USA**                 Neutral(s):          **F. King, Jr. Esq.**

Hearing Type: **Arbitration**                                                                                              **Rep# 2**

| Date/ Time | Description | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|
| 09/14/17 | F. King, Jr. Esq. Retainer Fees. To be applied to reading, research, preparation, etc. NOTE: At the conclusion of the case, any unused portion of this retainer will be refunded. | 5,152.00 | 1 | 5,152.00 |
| | Expenses/Retainers | | | 5,152.00 |
| | Total | | | $ 5,152.00 |

Invoice total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc. Payment is due upon receipt.

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**

Page 1 of 1



# INVOICE

**Invoice Date**
**11/03/17**

**Invoice Number**
**0004187028-440**

To: **Bobby Stricklin**
**Finance Source, LLC, d/b/a KarMike USA**
**448 Westbrooke Shopping Center US 70 Hwy**
**Havelock, NC 28532**

| | |
|---|---|
| Reference #: | **1440005277** AH |
| Billing Specialist: | **Erwin Gonzalez** |
| Email: | **egonzalez@jamsadr.com** |
| Telephone: | **(949) 224-4642** |
| Employer ID: | **68-0542699** |

RE: **Keslar, Joseph vs. Finance Source, LLC, dba KarMike USA**

Representing: **Finance Source, LLC, d/b/a KarMike USA**

Neutral(s): **F. King, Jr. Esq.**

Hearing Type: **Arbitration**

**Rep# 2**

| Date/Time | Description | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|
| 11/02/17 | F. King, Jr. Esq.<br>Retainer Fees.<br>To be applied to reading, research, preparation of award, etc.<br>NOTE: At the conclusion of the **case**, any unused portion of this retainer will be refunded. | 3,864.00 | 1 | 3,864.00 |
| | Expenses/Retainers | | | 3,864.00 |
| | Total | | | $ 3,864.00 |

---

Invoice total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc. **Payment is due upon receipt.**

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**